IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| MICHELLE GOODWIN,<br><br>   PLAINTIFF<br> v.<br><br>THE UNIVERSITY OF PENNSYLVANIA,<br><br>   DEFENDANT. | Civil Action No.: _____<br><br>JURY TRIAL DEMANDED |

## COMPLAINT AND JURY DEMAND

Plaintiff Michelle Goodwin, by and through her undersigned attorneys, Bell & Bell LLP, hereby files the following Complaint and Jury Demand ("Complaint").

## PRELIMINARY STATEMENT

1. This is an action for an award of damages, liquidated damages, punitive damages, attorneys' fees and other relief on behalf of Plaintiff Michelle Goodwin, a former employee of The University of Pennsylvania ("Defendant" or the "University"). Ms. Goodwin has been harmed by Defendant's harassment and discrimination based on her disabilities or perceived disabilities, and by Defendant's retaliation against her for her complaints about discrimination and harassment, as well as for seeking accommodations and taking leave pursuant to the Family and Medical Leave Act ("FMLA"), culminating in her wrongful suspension and subsequent termination.

2. This action is filed pursuant to the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101, et seq., the Family and Medical Leave Act, 29 U.S.C. § 2611, et seq., and the Pennsylvania Human Relations Act, 43 P.S. § 951, et seq. ("PHRA").

**JURISDICTIONAL STATEMENT**

3. This Court has original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States pursuant to 28 U.S.C. §§ 1331 and 1391.

4. The jurisdiction of this Court is also invoked pursuant to 28 U.S.C. § 1343(4), which grants the District Court original jurisdiction in any civil action authorized by law to be commenced by any person to recover damages to secure equitable or other relief under any act of Congress providing for the protection of civil rights.

5. This Court has supplemental jurisdiction over any Pennsylvania state law claims pursuant to 28 U.S.C. § 1367.

6. All conditions precedent to the institution of this suit have been fulfilled. On September 27, 2019, Plaintiff timely filed a Charge of Discrimination with the United States Equal Employment Opportunity Commission ("EEOC"), which was dual-filed as a Complaint with the Pennsylvania Human Relations Commission ("PHRC"). On November 30, 2020, the EEOC issued a Notice of Right to Sue to Plaintiff. This action has been filed within ninety (90) days of Plaintiff's receipt of said Notice. With respect to Ms. Goodwin's PHRC claims alleged herein, it has been over a year since she dual-filed her Complaint with the PHRC.

**VENUE**

7. This action properly lies in the Eastern District of Pennsylvania, pursuant to 28 U.S.C. § 1391(b).

8. This action properly lies in the Eastern District of Pennsylvania because the claims and significant activities associated with those claims arose in this judicial district, and Plaintiff was employed by and terminated by Defendant in this judicial district.

## PARTIES

9. Plaintiff Michelle Goodwin is an adult female citizen and resident of Philadelphia, Pennsylvania and the United States of America.

10. Defendant The University of Pennsylvania is a private research university located in Philadelphia, Pennsylvania.

11. Ms. Goodwin is a qualified individual with disabilities within the meaning of the ADA.

12. Ms. Goodwin has had her disabilities for a period far in excess of six months.

13. Ms. Goodwin's disabilities affect a major bodily function and substantially limits one or more major life activities.

14. At all relevant times, Defendant is and has been an employer employing more than 500 employees.

15. At all relevant times, employees of Defendant acted as agents and servants for Defendant.

16. At all relevant times, employees of Defendant were acting within the scope of their authority and in the course of employment under the direct control of Defendant.

17. At all times material hereto, Defendant acted by and through its authorized agents, servants, workmen and/or employees acting within the course and scope of their employment with Defendant and in furtherance of Defendant's business.

18. At all relevant times hereto, Plaintiff Michelle Goodwin was an "employee" of Defendant within the meanings of the laws at issue in this suit and is accordingly entitled to the protection of said laws.

19. At all relevant times hereto, Defendant was an "employer" and/or "person" under the laws at issue in this matter and is accordingly subject to the provisions of said laws.

20. During her employment, the University regarded Ms. Goodwin as disabled.

21. This cause of action arose out of transactions or occurrences that took place in whole or in part in Philadelphia, Pennsylvania.

22. Defendant does significant business within the Commonwealth of Pennsylvania.

23. This Honorable Court has jurisdiction over Defendant.

## **FACTS**

24. Ms. Goodwin was hired as a Videographer for the CPRE Knowledge Hub Media Team of the University of Pennsylvania, in its Graduate School of Education's Consortium for Policy and Research ("CPRE") department.

25. Ms. Goodwin excelled in her position as a Videographer, performing her duties in an excellent and professional manner.

26. Ms. Goodwin was initially supervised in her position by Bobbi Newman, Director of CPRE Knowledge Hub, who left the University shortly after Ms. Goodwin began her employment.

27. In Ms. Newman's absence, Ms. Goodwin's supervisor became Jonathan Supovitz, Executive Director of the CPRE department.

28. From the beginning of her employment with the University, Ms. Goodwin faced opposition and hostility from Mr. Supovitz, an academic with no background or experience in Ms. Goodwin's field of Videography and the process of creative work.

29. Despite her loyalty and consistent performance, and successful work that she had so often been applauded for, Ms. Goodwin was subjected to discrimination and harassment on the basis of her disabilities and/or perceived disabilities, and was retaliated against for her complaints about discrimination and harassment, as well as for seeking accommodations

and taking leave pursuant to the FMLA, culminating in her wrongful termination on August 5, 2019.

30. During the interview process with the University, Ms. Goodwin was told by Mr. Supovitz and Ms. Newman that the department planned to invest in industry-standard equipment and build a studio in the 5th Floor office space of 3440 Market Street, Philadelphia, that would be directed and supervised by Ms. Goodwin, based on her professional experience and recommendations.

31. The Videographer position was a new position in the department, which meant that the selected candidate would pave the way for the position.

32. Based on the representations outlined by Mr. Supovitz and Ms. Newman, Ms. Goodwin accepted the position of Videographer and began her employment in February 2018.

33. Prior to beginning employment, Ms. Goodwin submitted an equipment request list with specs, a working timeline for acquisition and installation, and a projected budget, at the request of Ms. Newman and Mr. Supovitz.

34. After Ms. Goodwin accepted the position, however, she was told by both Mr. Supovitz and Ms. Newman that there was not enough room in the budget to make the promised industry-standard purchases.

35. This lack of foresight and baseline knowledge of the position's needs despite creating the new position, were consistent with the lack of leadership, lack of understanding of the field, and lack of supervision demonstrated by Mr. Supovitz throughout Ms. Goodwin's employment.

36. Ms. Goodwin's responsibilities were quickly re-directed to a more cost-friendly form of digital media – podcasting.

37. Indeed, Ms. Goodwin's job responsibilities became almost exclusively podcasts within the first few weeks of the start of her employment.

38. Notwithstanding this unexpected change, Ms. Goodwin took on the necessary tasks without complaint and produced a number of professional, quality podcasts and videos for the University.

39. At the time Ms. Goodwin began her employment with the University, she had been newly diagnosed with Bipolar Disorder and had recently started receiving medical care.

40. Ms. Goodwin's position with the University began shortly after a difficult and stressful personal situation.

41. This personal situation, coupled with trying to navigate having accepted a position that was misrepresented and not commensurate with her experience and credentials, caused Ms. Goodwin to admit herself to Penn Presbyterian Hospital as an inpatient for four days due to the exacerbation of her disability's symptoms.

42. Ms. Goodwin provided her supervisor, Ms. Newman and Mr. Supovitz, documentation evidencing her hospital stay.

43. On this basis alone, without any knowledge or understanding of Ms. Goodwin's work or disability, Mr. Supovitz verbally questioned Ms. Goodwin's ability to handle the position.

44. Thereafter, Ms. Goodwin amply proved that she could more than "handle" the job.

45. Throughout her employment at the University, Ms. Goodwin consistently produced professional quality work, met all of her deadlines, and worked efficiently and independently, building her own timelines, corresponding with "clients" in the

department, and problem-solving in the face of change, from video to animations and podcasts.

46. Despite her excellent work, consistent praise from colleagues, and creating an award-winning documentary for a division within CPRE, Ms. Goodwin had difficulty working with, and faced unjustified and unwarranted hostility, harassment and discriminatory behavior, from Mr. Supovitz.

47. Mr. Supovitz has a reputation at the University for his tendency to be hot-tempered, bullyish, and dismissive of women in the workplace.

48. According to a former employee of the department, Mr. Supovitz once told her that she'd be a "great model," a suggestion she found inappropriate and shared with Ms. Goodwin before she left the University.

49. Mr. Supovitz also demonstrated his favoritism of Ms. Goodwin's male co-worker, Keith Heumiller, on a number of occasions, consistently excusing Mr. Heumiller's regular tardiness and uncooperative attitude when it came to collaborating with Ms. Goodwin.

50. In or about May 2018, Ms. Goodwin contacted the University's Graduate School Human Resources Department and requested an accommodation for her disability to attend doctor's appointments once a week during her lunch break, as her physicians did not see patients after work hours.

51. Notably, despite having attended such appointments during her lunch break, Ms. Goodwin had been meeting her deadlines and providing accurate timetables, turnaround data, and prompt responses to all correspondence.

52. In response to her request for accommodations, Human Resources informed Ms. Goodwin that the University would be extending her employment probationary period.

53. When Mr. Supovitz found out about Ms. Goodwin's accommodation request through Human Resources, he demanded that she "be transparent" and reveal her medical condition to him (which she did), and relayed his "disappointment" that she went to Human Resources instead of talking to him first.

54. Mr. Supovitz told Ms. Goodwin that "HR muddies things up."

55. In an attempt to soothe the situation, and deflect Mr. Supovitz's anger towards her, Ms. Goodwin rescinded her accommodation request and sought a new physician who would be able to see her after-hours.

56. Shortly thereafter, while Ms. Goodwin was on her lunch break, Mr. Supovitz accused her of not being at her desk and gave her a verbal warning.

57. Ms. Goodwin noted that Mr. Heumiller, her co-worker, regularly arrived to work at least one hour late every day, took multiple smoking breaks throughout the day and often took extended lunch breaks.

58. Ms. Goodwin asked Mr. Supovitz if Mr. Heumiller also had received a verbal warning.

59. Mr. Supovitz responded that it was none of her business.

60. In or about November 2018, Ms. Goodwin suffered an episode relating to her disability in which she fell and broke her ankle in two places, requiring surgery.

61. The ankle injury Ms. Goodwin suffered is both directly related to her disability, and is itself a disability.

62. Although bedridden for 3-4 weeks, Ms. Goodwin effectively worked from home throughout that time, and completed and published several projects in her typical efficient and excellent manner.

63. During the time Ms. Goodwin worked from home, her co-collaborator and CPRE KHub team member, Keith Heumiller, failed to prepare, secure and schedule a series of important podcast interviews tied to KAPPAN magazine – responsibilities of his position that affected Ms. Goodwin's workload.

64. Mr. Heumiller's lack of planning for the KAPPAN series resulted in Ms. Goodwin's workload unexpectedly flooded with several podcasts that needed to be mastered and published within the week.

65. In nearly every podcast, Mr. Heumiller submitted a raw interview for Ms. Goodwin to master only 24 hours before it was due to be published.

66. When Ms. Goodwin voiced her concern to Mr. Heumiller about the last-minute nature of his workflow and lack of cooperation and respect in regards to her own work timeline, Mr. Supovitz became involved, demanding that Ms. Goodwin expedite her work to meet the deadline agreement with KAPPAN Magazine.

67. Ms. Goodwin explained to Mr. Supovitz that, although the KAPPAN Series had been on the docket for a few months, Mr. Heumiller had waited until just before the due date to host the interviews, passing his portion of the project to Ms. Goodwin for completion only hours before a hard deadline to publish.

68. Ms. Goodwin requested to Mr. Supovitz that projects be initiated as far in advance as possible, to avoid similar situations where the quality of the work was in jeopardy.

69. Mr. Supovitz rejected Ms. Goodwin's request, saying that if she was unable to keep up with the workflow, the position was not right for her.

70. Ms. Goodwin contacted Ms. Emma Grigore of Penn GSE's Human Resources department to discuss the matter, to which Ms. Grigore suggested Ms. Goodwin explain the technical process and requirements to both Mr. Supovitz and Mr. Heumiller.

71. Ms. Goodwin crafted a detailed email, explaining the process of mastering audio, providing examples of the back-end work she had created for KHub, referencing workflows of other professionals in the field, and explaining how her time was allocated.

72. Mr. Supovitz had no response to Ms. Goodwin's email.

73. Mr. Heumiller continued to pass along projects at the last minute, making Ms. Goodwin's job unnecessarily more difficult.

74. Upon Ms. Goodwin's return in December 2018, Ms. Goodwin approached Ms. Grigore and Ms. Coral Haas of Human Resources, asking for help to soothe the situation between her, Mr. Supovitz, and Mr. Heumiller, and hoping to create a more successful collaboration amongst the team.

75. Ms. Goodwin had also approached Ms. Haas in tears, fearful for her safety, after a conversation with an angry Mr. Supovitz, who had stormed out of Ms. Goodwin's office, face red and fists clenched.

76. Ms. Goodwin told Ms. Haas that she was worried for her physical safety in Mr. Supovitz's company.

77. Despite Ms. Goodwin's obvious distress, Ms. Haas informed Ms. Goodwin that there was no disciplinary action to be taken because there were no witnesses to the event.

78. Ms. Goodwin continued to approach HR with concerns, and Ms. Grigore insisted that Ms. Goodwin was to do what her supervisor, Mr. Supovitz, requested, and that Ms. Goodwin must meet his expectations, despite his lack of knowledge in the field.

79. Ms. Goodwin asked Ms. Grigore to investigate Mr. Supovitz's discrimination, harassment and retaliation directed at Ms. Goodwin.

80. Ms. Goodwin was told that no discrimination was discovered, but Ms. Goodwin was not permitted to see the report that was allegedly created in connection with this alleged investigation.

81. Mr. Heumiller continued to be uncooperative with Ms. Goodwin, and Mr. Supovitz continued to allow Mr. Heumiller to disregard Ms. Goodwin's requests for a streamlined workflow to allow for the appropriate amount of time needed for a project.

82. Ms. Goodwin's time in the office in December post-surgery was short-lived, as icy conditions prevented safe travels for Ms. Goodwin, who was still incapacitated and used a medical scooter to get around.

83. The University refused to provide transportation to Ms. Goodwin to get to the office despite her request, and public transportation between her home and the office was not accessible, so Ms. Goodwin was left with no other choice than to use Lyft, at her own cost, to physically travel to work.

84. Ms. Goodwin requested accommodations to spend the last weeks of December working from home.

85. Mr. Supovitz was openly annoyed by Ms. Goodwin's need for additional accommodations at that time, despite her success and consistency when working from home.

86. Ms. Goodwin officially returned to the office in January 2018, still using a medical scooter, and began preparing for an important and costly video shoot that had been on the docket since Fall 2018 and that was to take place during the last week of January.

87. Upon her arrival, Ms. Goodwin questioned her teammates, Mr. Heumiller and Ms. Bridget Goldhahn, about plans for the project.

88. Both co-workers said that they did not know what the plans were.

89. Mr. Supovitz thereafter informed Ms. Goodwin that he had decided to take her off the video shoot and replace her with a freelance videographer they had worked with in the past – Jon Crescenzo.

90. Mr. Supovitz directed Ms. Goodwin to provide the equipment rental list she had crafted for the shoot, as well as other elements she had made in preparation for the shoot, to the freelancer.

91. Ms. Goodwin asked Mr. Supovitz if she could be on-set to help guide the shoot and serve as a second pair of eyes, as the freelancer routinely produced unprofessional work, but Mr. Supovitz denied the request.

92. Ms. Goodwin contacted Human Resources regarding Mr. Supovitz's attempt to replace her.

93. Mr. Supovitz was informed by Ms. Grigore that he needed to allow Ms. Goodwin to perform her job and be on the shoot with an accommodation of an assistant to carry gear.

94. Mr. Supovitz begrudgingly allowed Ms. Goodwin to perform her job duties for the shoot.

95. In addition, around that time, Mr. Supovitz demanded that Ms. Goodwin record a "half-day" on the morning of the first interview shoot, despite her annotations on the production schedule that she was on-location, on the clock, and receiving and installing equipment for the shoot.

96. When Ms. Goodwin noted that Mr. Heumiller only worked on-set from 10:15 a.m. to 3 p.m., Mr. Supovitz told her not to deflect to other people.

97. Mr. Supovitz's insistence that Ms. Goodwin record that she was absent from her duties that morning of the shoot is believed to be an act of retaliation for Ms. Goodwin's request for accommodations.

98. Ms. Goodwin contacted Ms. Grigore again for help, complaining about the discriminatory and retaliatory behavior by Mr. Supovitz. Ms. Grigore directed that Mr. Supovitz rescind his request that Ms. Goodwin log a "half-day," which Mr. Supovitz did.

99. Ms. Goodwin requested that Mr. Supovitz's behavior be investigated as retaliatory and discriminatory.

100. Ms. Goodwin submitted multiple written complaints to Ms. Grigore about Mr. Supovitz's increasingly hostile behavior.

101. Thereafter, due to increasingly harmful symptoms brought on by her disabilities that were specifically exacerbated by Mr. Supovitz's inappropriate and retaliatory behavior, Ms. Goodwin applied for and took leave pursuant to FMLA and Short-Term Disability.

102. Immediately upon Ms. Goodwin's return from FMLA leave, in August 2019, she was terminated.

103. The University informed Ms. Goodwin that her position had been closed.

104. In her meeting on August 5, 2019, Ms. Goodwin asked when the decision had been made to close the position.

105. Ms. Grigore reported that she had planned to notify Ms. Goodwin of the change on the day Ms. Goodwin began her leave pursuant to the FMLA. Mr. Supovitz added that they began discussing the closure of the position in mid-January.

106. The timeline provided by the University suggests that Mr. Supovitz petitioned for the position to close during the time that Ms. Goodwin was requesting accommodations to do her job by way of having an assistant to help with the shoot.

107. If the timeline presented by the University is incorrect, it suggests that the decision to close the position came about only after Ms. Goodwin took leave pursuant to the FMLA.

108. Notably, since the time that Ms. Goodwin was on leave, the CPRE KHub team continued to publish podcasts.

109. Before Ms. Goodwin left, she had sent a detailed email to Mr. Heumiller, outlining the process, media storage and how to use the templates to create podcasts in her absence.

110. Thus, it appears that Ms. Goodwin's responsibilities are being performed using the information, knowledge and experience provided by Ms. Goodwin, and the KHub team continues to produce the Digital Media Content that Ms. Goodwin had previously produced.

111. Any claim that Ms. Goodwin's position was actually eliminated or that there was a lack of work is belied by Defendant's actions since her termination.

112. More specifically, Defendant has replaced Ms. Goodwin with Jon Crescenzo, who continued to perform Ms. Goodwin's responsibilities following her termination, despite Defendant giving him a different job title than Ms. Goodwin held.

113. Notably, Mr. Crescenzo had originally applied for, but been passed over for Ms. Goodwin's position in favor of Ms. Goodwin.

114. Further, the rate at which Defendant continues to produce podcasts since Ms. Goodwin's termination suggests that lack of work is merely a pretextual explanation for Ms. Goodwin's termination.

115. The reasons given for Ms. Goodwin's termination were pretextual.

116. The reasons provided for Ms. Goodwin's termination are all pretext, as Ms. Goodwin had been consistently dedicated and hardworking with excellent performance, had never received any disciplinary action or warnings, and the grounds for termination were false because, as always, the University demonstrated its preference for Mr. Heumiller by retaining him and having him absorb Ms. Goodwin's job responsibilities.

117. The above facts indicate that the University sought to terminate Ms. Goodwin on the alleged basis of position elimination, while actually retaining the preferred Mr. Heumiller to perform the job responsibilities once Ms. Goodwin provided the information needed to perform the job.

118. Even more tellingly, the University terminated Ms. Goodwin immediately upon her return from FMLA leave.

119. The timing of Ms. Goodwin's termination, coupled with the harassing and discriminatory treatment that she was subjected to, the lack of any legitimate justification for her termination, and lack of any appropriate response from the University to Ms. Goodwin's multiple complaints of discrimination and harassment, indicates that the real reason for Ms. Goodwin's termination was discrimination and retaliation on the part of Defendant.

120. Ms. Goodwin's termination was pretextual.

121. Ms. Goodwin's termination was wrongful.

122. Despite her loyalty, dedication and consistently excellent performance, and given her treatment during her employment with the University (including, but not limited to, her wrongful termination), Ms. Goodwin was subjected to discrimination and harassment on the basis of her disabilities and/or perceived disabilities, and was retaliated against for her

complaints and for seeking accommodations and for seeking and taking leave pursuant to the FMLA.

123. Ms. Goodwin was subjected to discrimination and harassment on the basis of her disabilities and/or perceived disabilities, was retaliated against for her complaints about the discrimination and harassment, and was retaliated against for seeking leave pursuant to the FMLA, in violation of the Americans with Disabilities Act, the Family and Medical Leave Act, and the Pennsylvania Human Relations Act.

124. Ms. Goodwin has suffered and continues to suffer mental anguish and severe emotional distress as a proximate result of the and/or inactions of Defendant.

125. Defendant discriminated against Ms. Goodwin because of her disabilities or perceived disabilities, and retaliated against Ms. Goodwin for complaining of the discrimination, and retaliated against Ms. Goodwin, for seeking accommodations and for seeking and taking leave pursuant to the FMLA, in violation of the ADA, the FMLA and the PHRA.

126. Ms. Goodwin has suffered mental anguish and severe emotional distress as a proximate result of the actions and inactions of Defendant.

127. Defendant and its agents acted with the intent of causing or with reckless disregard for the probability that their actions would cause Ms. Goodwin severe emotional distress.

128. Ms. Goodwin has suffered financial losses, which include, among other things, lost wages, and an obligation for attorneys' fees and costs of bringing suit, as a proximate result of the actions and inactions of Defendant.

## COUNT I
## The Americans with Disabilities Act, 42 U.S.C. § 12101, et seq.

129. Plaintiff Michelle Goodwin repeats and incorporates by reference the allegations of all previous paragraphs as if fully set forth at length herein.

130. Based on the foregoing, Defendant engaged in unlawful employment practices in violation of the Americans with Disabilities Act.

131. In discriminating against and harassing Ms. Goodwin on the basis of her disabilities and/or because Defendant regarded Ms. Goodwin as disabled, and in retaliating against Ms. Goodwin for her complaints and for seeking accommodations Defendant violated the ADA.

132. Said violations were intentional and willful.

133. Said violations warrant the imposition of punitive damages.

134. As the direct and proximate result of Defendant's violation of the Americans with Disabilities Act, Plaintiff Michelle Goodwin has sustained loss of earnings, severe emotional and psychological distress, personal embarrassment, loss of self-esteem, loss of future earning power, as well as back pay, front pay, and interest due thereon, and has incurred attorneys' fees and costs.

**COUNT II**
**The Family and Medical Leave Act, 29 U.S.C. § 2611, et seq.**
**Retaliation**

135. Plaintiff Michelle Goodwin repeats and incorporates by reference the allegations of all previous paragraphs as if fully set forth at length herein.

136. Defendant's conduct, in retaliating against Ms. Goodwin for requesting and taking medical leave pursuant to the Family and Medical Leave Act, violated the FMLA.

137. Defendant's violations of the FMLA were intentional and willful, as Defendant knew or should have known the requirements of the FMLA.

138. Defendant's violations of the FMLA warrant the imposition of liquidated damages.

139. As a direct and proximate result of Defendant's violations of the FMLA, Plaintiff Michelle Goodwin has sustained loss of earnings, severe emotional and psychological distress, personal embarrassment, loss of self-esteem, loss of future earning power, as well as back pay, front pay, and interest due thereon, and has incurred attorneys' fees and costs.

## COUNT III
## Pennsylvania Human Relations Act, 43 P.S. § 951, et seq.

140. Plaintiff Michelle Goodwin repeats and incorporates by reference the allegations of all preceding paragraphs as if fully set forth at length herein.

141. Based on the foregoing, Defendant engaged in unlawful employment practices in violation of the Pennsylvania Human Relations Act.

142. In harassing and discriminating against Ms. Goodwin on the basis of her disabilities and/or perceived disabilities, and retaliating against Ms. Goodwin for her complaints and for seeking accommodations Defendant violated the Pennsylvania Human Relations Act.

143. As a direct result of the unlawful employment practices engaged in by Defendant, Plaintiff Michelle Goodwin has sustained loss of earnings, severe emotional and psychological distress, personal embarrassment, loss of self-esteem, loss of future earning power, as well as back pay, front pay, and interest due thereon, and has incurred attorneys' fees and costs.

## PRAYER FOR RELIEF

144. Plaintiff Michelle Goodwin repeats and incorporates by reference the allegations of all previous paragraphs as if fully set forth at length herein.

**WHEREFORE**, Plaintiff Michelle Goodwin respectfully requests that this Court enter judgment in her favor and against Defendant and Order:

(a) Appropriate equitable relief;

(b) Defendant to compensate Plaintiff with a rate of pay and other benefits and emoluments of employment to which she would have been entitled had she not been subjected to unlawful discrimination, harassment and retaliation;

(c) Defendant to compensate Plaintiff with the wages and other benefits and emoluments of employment lost because of its unlawful conduct;

(d) Defendant to pay Plaintiff punitive damages;

(e) Defendant to pay Plaintiff liquidated damages;

(f) Defendant to pay Plaintiff compensatory damages for future pecuniary losses, pain and suffering, inconvenience, mental anguish, loss of employment and other nonpecuniary losses as allowable;

(g) Defendant to pay Plaintiff's costs of bringing this action and her attorneys' fees;

(h) Plaintiff be granted any and all other remedies available pursuant to the ADA, FMLA and PHRA; and

(i) Such other and further relief as is deemed just and proper.

## JURY DEMAND

Plaintiff hereby demands trial by jury as to all issues so triable.

*/s/Christopher A. Macey, Jr.*
Christopher A. Macey, Jr., Esquire
Bell & Bell LLP
One Penn Center
1617 JFK Blvd. – Suite 1254
Philadelphia, PA  19103

*Attorneys for Plaintiff Michelle Goodwin*

Dated:  February 18, 2021