**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **MICHELLE GOODWIN** | : | **CIVIL ACTION** |
| | : | |
| **v.** | : | **NO. 21-755** |
| | : | |
| **THE UNIVERSITY OF** | : | |
| **PENNSYLVANIA** | : | |

## <u>MEMORANDUM</u>

**KEARNEY, J.**                                                **November 20, 2023**

An employee describing a supervisor's criticisms as discriminatory or retaliatory does not make it so. Nor do these conclusory labels state claims under federal law. Fired employees must adduce evidence beyond their beliefs. We today address an employer who offered several accommodations to a videographer with bipolar disorder and later slowed by a fractured ankle. The employer hired her under a defined job description tied to videography. Her supervisor and co-workers noted and criticized her work product. The employer still extended accommodations. But eventually the employer found no further need for a videographer as its business plan shifted to podcasts. The employer terminated the videographer. The videographer sued her employer for discrimination, retaliation, and harassment under the Americans with Disabilities Act, retaliation under the Family and Medical Leave Act, and discrimination, retaliation, and harassment under the Pennsylvania Human Relations Act. We dissected facts adduced during discovery. The videographer offers nothing more than her repeated mantra of discrimination and retaliation. She disputes immaterial facts while the material facts are not disputed. She does not adduce a prima facie case. But even if she did, she cannot show the employer fired her for a reason other than the employer's long-anticipated change in business strategy to podcast media even putting aside her documented performance concerns. We grant the employer summary judgment.

## I.   Facts adduced in discovery[1]

The University of Pennsylvania hired Michelle Goodwin as an at-will Videographer for its Consortium for Policy Research in Education on February 12, 2018.[2] Dr. Jon Supovitz hired Ms. Goodwin.[3] Ms. Goodwin's employment depended "in part, upon [her] successfully meeting the established performance expectations for the [Videographer] position."[4] The University required every staff member including Ms. Goodwin to "complete an introductory period" to "demonstrate satisfactory performance."[5] The University explained to Ms. Goodwin "external funding" paid her salary so her employment remained "contingent, in part, upon the continued receipt of these funds."[6]

### *Ms. Goodwin's role at the University.*

The University's Consortium "engage[d] researchers, policymakers and practitioners" and published videos and podcasts related to education.[7] The Consortium hired three full time employees: Ms. Goodwin as a Videographer; Keith Heumiller as a "Communications Specialist[,]"; and Bridget Goldhahn as "Communications Director."[8] The Consortium hired Jon Crescenzo as a part-time employee beginning in 2016 to help the "content manager" with "video shoots and podcasting."[9]

The University hired Mr. Heumiller "to maintain the website content, to assist in editing and compiling videos, and to assist with the podcast and social media."[10] Mr. Heumiller and Ms. Goodwin "worked on different aspects of [the same] content."[11] The University hired Ms. Goldhahn in a "public relations" role involving "advertising, dissemination of [the Consortium's] sterling products, graphic design, website management, [and] any kind of special creative project management."[12] Mr. Crescenzo swore he completed "very minimal" graphics and sound effects

for Consortium videos.[13] Mr. Crescenzo assisted on video shoots and swore he was unqualified to run video shoots during Ms. Goodwin's tenure.[14]

The University described the primary job responsibilities of the Videographer position as "videotaping, editing videos, and assembling material into final products that include graphics, audio tracts, and sound effects."[15] The Videographer "work[ed] with other team members to conceptualize, shoot, edit online video and audio content to create final products videos, podcasts, and contributes [sic] to digital media campaigns."[16] The University disclosed in the Videographer job description the "[p]osition [is] contingent upon continued grant funding."[17] Ms. Goodwin did not anticipate assisting with podcasting, though ultimately a "cheaper alternative[,]" would constitute "the majority of [her] workload as a videographer."[18]

### Ms. Goodwin's first request for accommodations related to her bipolar disorder.

Ms. Goodwin suffers from bipolar disorder, attention deficit hyperactivity disorder, and post-traumatic stress disorder.[19] Ms. Goodwin first requested accommodations from the University on April 16, 2018.[20] Ms. Goodwin requested "time from the work week to attend appointments related to my disability."[21] Ms. Goodwin requested accommodations to attend bi-weekly therapy sessions for a six-month period.[22]

Human Resources Associate Director Patrice Miller sent a letter to Human Resources Specialist Coral Haas on May 7, 2018 copying Ms. Goodwin and Dr. Supovitz explaining Ms. Goodwin requested the University provide her "with reasonable accommodations for her medical condition" and granting Ms. Goodwin's request.[23] Associate Director Miller did not mention Ms. Goodwin suffers from bipolar disorder.[24] Associate Director Miller stated Ms. Goodwin will attend "medical appointments" twice a week during her lunch break.[25]

Ms. Goodwin met with Human Resources Specialist Haas and Dr. Supovitz to "discuss [her] disability accommodations."[26] Human Resources Specialist Haas told Ms. Goodwin her probationary period would be extended an additional month.[27] Associate Director Miller explained extending an employee's probationary period "is usually provided to benefit the employee so that they have a sufficient period of time to demonstrate mastery of the job responsibilities."[28] Ms. Goodwin responded the extension of her probationary period "fe[lt] like discrimination for [her] requesting accommodations."[29] Ms. Goodwin asked the University reconsider its extension of her probationary period "otherwise [she would] consider [the extension] an act of discrimination."[30] Ms. Goodwin emailed Associate Director Miller fifteen minutes later citing the Americans with Disabilities Act arguing she "believe[d] that [she is] being discriminated against for [her] accommodation request" and the extension "violates the ADA."[31]

Ms. Goodwin emailed Associate Director Miller the following day asking if she could rescind her request for accommodations and whether her desired rescission negated the extension of her probationary period.[32] Dr. Supovitz responded requesting the University extend Ms. Goodwin's probationary period "for one month only, instead of two."[33] Human Resources Specialist Haas agreed to the one-month extension.[34] Associate Director Miller responded she would keep Ms. Goodwin's accommodations in place "in the event that there is a need for [Ms. Goodwin] to make an appointment during working hours."[35] Associate Director Miller assured Ms. Goodwin the extension of her probationary period did not penalize Ms. Goodwin "for [her] requesting the accommodation."[36] Ms. Goodwin responded she no longer needed the accommodations and expressed disappointment with the University's response.[37]

Ms. Goodwin "felt" the University extended her probationary period to punish her request for accommodations.[38] Ms. Goodwin swore Dr. Supovitz "asked [her] to disclose [her] disability" following her April 16, 2018 request for accommodations.[39] Ms. Goodwin swore she "[does not] remember the conversation" but remembers she told Dr. Supovitz she suffers from bipolar disorder in April 2018.[40]

### The Consortium moves away from video production.

Ms. Goodwin and Dr. Supovitz realized the Consortium had diminishing video production work starting in October 2018.[41] The Consortium originally planned to build a videography studio but decided against it because the Consortium shifted from videography to podcast production.[42] The Consortium's shift toward podcast production caused Ms. Goodwin to "bec[o]me a lot less busy" and required her to assist in the "recording and editing of podcasts."[43]

Ms. Goodwin asked for a copy of her job description from the Human Resources Department on October 22, 2018.[44] Ms. Goodwin swore the Videographer job description did not accurately capture her contributions because her "position was mostly podcast production."[45]

### Ms. Goodwin's and Dr. Supovitz's interaction in October 2018.

Dr. Supovitz emailed Human Resources Specialist Haas on October 16, 2018 describing an "unsettling conversation" with Ms. Goodwin.[46] Dr. Supovitz said Ms. Goodwin arrived late to work and left early.[47] Dr. Supovitz worried Ms. Goodwin was "tak[ing] advantage of" the flexibility the University afforded her.[48] Dr. Supovitz asked for Human Resources Specialist Haas's input believing Ms. Goodwin "[was] not fitting well into our organization."[49]

Ms. Goodwin emailed Chief People Officer Grigore on October 17, 2018 to schedule a meeting.[50] Chief People Officer Grigore swore the meeting concerned an interaction between Ms. Goodwin and her "manager."[51] Ms. Goodwin felt nervous her manager "would be upset with

her."[52] Chief People Officer Grigore swore Ms. Goodwin's interactions with her manager did not concern Ms. Goodwin's medical leave and related to a "normal work-type problem."[53]

Chief People Officer Grigore's notes from her October 19, 2018 meeting with Ms. Goodwin confirm Ms. Goodwin worried Dr. Supovitz "[was] going to scream at [Ms. Goodwin]."[54] Ms. Goodwin told Chief People Officer Grigore Dr. Supovitz "barged into [Ms. Goodwin's office" without "set[ting] up [a] meeting."[55] Ms. Goodwin told Chief People Officer Grigore Dr. Supovitz's "fists were clenched [and] he was red."[56] Dr. Supovitz did not scream at Ms. Goodwin but Ms. Goodwin "thinks [Dr. Supovitz] will [yell]" at her eventually.[57] Chief People Officer Grigore noted Ms. Goodwin "use[d] very strong language, but backtracked when pressed."[58] Chief People Officer Grigore swore Ms. Goodwin's "details" of her interaction with Dr. Supovitz "softened" the more Chief People Officer Grigore prodded Ms. Goodwin.[59]

Ms. Goodwin swore she did not recall her discussion with Chief People Officer Grigore on October 19, 2018.[60] Dr. Supovitz swore he did not recall "an occasion" where he "became so upset . . . with Ms. Goodwin that he left her office in the middle of a discussion."[61]

### *Ms. Goodwin fractures her ankle and requests accommodations to work from home.*

Ms. Goodwin emailed Dr. Supovitz on November 5, 2018 explaining she "fractured her ankle" and could be "cleared to return on [November 7, 2018]."[62] Ms. Goodwin emailed Dr. Supovitz on November 9, 2018 disclosing the doctors recommend she have surgery on her fractured ankle on November 16, 2018 and requested she be allowed to work from home.[63] The University granted Ms. Goodwin's request to work from home.[64]

Dr. Supovitz and Mr. Heumiller emailed Ms. Goodwin on November 30, 2018 to discuss delays in Ms. Goodwin's work product.[65] Mr. Heumiller previously sent podcast materials for Ms. Goodwin to work on "ASAP."[66] Mr. Heumiller completed a portion of Ms. Goodwin's

assigned work "reliev[ing] a substantial portion of [her] work" on the podcast.[67] Ms. Goodwin responded requesting longer notice for her podcast deliverables.[68] Dr. Supovitz reminded Ms. Goodwin she "had known about [one of] the [podcasts] for a while now" and explained the Consortium "need[ed] to be fast and nimble and opportunistic" preventing University Consortium employees from having advanced notice of their work responsibilities.[69]

Ms. Goodwin emailed Dr. Supovitz, Ms. Green, Human Resources Specialist Haas, and Chief People Officer Grigore the following day requesting further allowance to work from home.[70] Dr. Supovitz forwarded Ms. Goodwin's email to Human Resources Specialist Haas and Chief People Officer Grigore stating "[t]he last month with [M]ichelle Goodwin working from home has been difficult and unproductive."[71] Dr. Supovitz attached a calendar detailing Ms. Goodwin's work product for November 2018 summarizing the "issues" related to Ms. Goodwin's work product.[72] Dr. Supovitz's calendar recounts Ms. Goodwin "[d]oes not work steadily unless she is closely monitored[;] . . . [b]lames co-workers and lack of process[;] . . . [h]as trouble prioritizing multiple responsibilities[;] [is] [v]erbally inappropriate with boss and co-workers[;] [i]s untruthful/evasive in response to email questions[; and] [i]s active on social media on personal issues multiple times during the work day."[73]

Ms. Goodwin formally requested accommodations for her fractured ankle on December 7, 2018.[74] Ms. Goodwin wrote "Video & Podcast Producer" as her job title.[75] The University granted Ms. Goodwin's requested accommodation to work from home because of her ankle fracture on December 18, 2018.[76] The University required Ms. Goodwin to return to in-person work on January 2, 2019.[77] Ms. Goodwin swore she requested transportation from the University.[78] The University has a program to help employees with mobility issues attend work and countered it had no record of Ms. Goodwin's request for transportation accommodations.[79]

Ms. Goodwin opined her fractured ankle "is going to follow [her] the rest of [her] life."[80] Ms. Goodwin swore her ankle "impact[s]" her ability to do yoga, ride a bike, crouch down, and walk.[81] Ms. Goodwin completed a "very brief" stint of physical therapy for her fractured ankle.[82] Ms. Goodwin does not currently see a physician for her ankle.[83]

### Dr. Supovitz looks to eliminate the Videographer position relying upon podcasts.

Dr. Supovitz considered eliminating the Videographer position "[a]round Christmas or New Year's" 2018.[84] Dr. Supovitz drafted the "[Consortium] Knowledge Hub Reorganization Plan" on January 2, 2019.[85] The Consortium "gain[ed] video content" by sending its employees to events, renting videographer and recording equipment, creating a "temporary video studio in a hotel room" and "conduct[ing] about 8-10 interviews" during the events "[f]rom 2016-2018."[86] The Consortium contracted out videographer work for one "special video project[]."[87]

Dr. Supovitz suggested the Consortium stop attending events and conducting "video shoots at policy meetings and concentrate more on podcasts" after assessing the Consortium's strategy, receiving "feedback from [its] advisory board," reviewing the Consortium's "viewership data," and reviewing the Consortium's "financial considerations"[88] The Consortium's video shoots "are considerably more expensive to conduct" than its podcast episodes.[89] The Consortium's video viewership declined during 2018 while its podcast listenership increased.[90] Dr. Supovitz suggested the Consortium "eliminate the videographer position" as part of its change in emphasis to podcast production.[91] The Consortium intended to "contract for videographer activity" as necessary after eliminating Ms. Goodwin's position.[92]

### Ms. Goodwin complains about Dr. Supovitz to Human Resources.

While working from home with the University's approval because of her fractured ankle in December 2018, Ms. Goodwin emailed the Consortium team and requested hiring Mr.

Crescenzo "as a freelancer" to help her carry videographer gear and set up her video shoot occurring at the end of January 2019.[93] Ms. Goodwin suggested Mr. Heumiller attend the video shoot as well.[94] Ms. Goodwin noted she would be "still be on a scooter at that point, and unable to put weight on [her] leg."[95]

Dr. Supovitz informed Ms. Goodwin she would not be needed at the late January 2019 video shoot and opted instead to have Mr. Crescenzo serve as the videographer.[96] Dr. Supovitz swore he removed Ms. Goodwin from the video shoot because "[he] was concerned" the video equipment wiring "would potentially be a hazardous environment for somebody with a scooter."[97]

Ms. Goodwin emailed Chief People Officer Grigore and Human Resources Specialist Haas on January 3, 2019 asking to meet concerning Dr. Supovitz's decision to remove her from the video shoot.[98] Ms. Goodwin characterized Dr. Supovitz's decision as "discrimination."[99]

Ms. Goodwin met with Chief People Officer Grigore on January 10, 2019 to discuss Ms. Goodwin's removal from the video shoot.[100] Chief People Officer Grigore took notes during the meeting.[101] Ms. Goodwin expressed her dissatisfaction with her role at the Consortium noting her "video work has dropped immensely" and admitting video shoots "are expensive."[102] Ms. Goodwin explained she considered Dr. Supovitz's decision to remove her from the video shoot as "discrimination" because "she disclosed to him in the fall that she had bipolar disorder."[103] Chief People Officer Grigore asked Ms. Goodwin "how she saw that correlation" between her disclosure of her illness and Dr. Supovitz's decision to remove Ms. Goodwin from the video shoot.[104] Ms. Goodwin stated "I have no reason, it's just my assumption."[105] Ms. Goodwin admitted Dr. Supovitz did not discipline her for going to appointments.[106]

Ms. Goodwin told Chief People Officer Grigore she switched to a therapist who could meet her after work in Spring 2018 by "[her] own choice" and Dr. Supovitz did not ask her to do so.[107] Ms. Goodwin "felt" she needed to change therapists "because of [Dr. Supovitz's] attitude."[108] Chief People Officer Grigore noted Ms. Goodwin "repeatedly" referred to "[her] perception" when asked about Dr. Supovitz and further explained "[Dr. Supovitz] didn't explicitly say or do anything."[109]

Ms. Goodwin told Chief People Officer Grigore she "liv[es] in fear every time [Ms. Goodwin] comes to work" because Ms. Goodwin feels intimidated by Dr. Supovitz.[110] Ms. Goodwin worried Dr. Supovitz would yell at her "at some point" even though she admitted "he has not yelled at her since [October 2018], nor has she witnessed him yelling at any other employees."[111] Ms. Goodwin asked Chief People Officer Grigore if the Videographer position "could be eliminated with the lack of work."[112] Chief People Officer Grigore stated the position could be eliminated and Ms. Goodwin responded "[I] would be ok with that or maybe I should just go on short term disability."[113]

**Human Resources investigates Ms. Goodwin's January 2019 complaint against Dr. Supovitz.**

Chief People Officer Grigore discussed Ms. Goodwin's complaint with Dr. Supovitz on January 11, 2019.[114] Dr. Supovitz explained he removed Ms. Goodwin from the video shoot out of concern for her safety in the "messy environment" of wires and video equipment.[115] Dr. Supovitz considered Mr. Crescenzo competent to run the video shoot because he worked on all video shoots predating Ms. Goodwin's hiring.[116] Dr. Supovitz stated Ms. Goodwin's presence at video shoots is "[u]npredictab[le]" and noted she previously "called out last minute" on a video shoot in November 2018.[117] Dr. Supovitz acknowledged the Consortium "dramatically reduced" video production in favor of podcast production because of the relative costs.[118] Dr. Supovitz

noted Mr. Heumiller completed "the majority of the work" for podcasts.[119] Dr. Supovitz said Ms. Goodwin's disabilities did not impact her work and he has not "taken action" against Ms. Goodwin because of her disabilities.[120]

Chief People Officer Grigore relayed her conversation with Dr. Supovitz to Ms. Goodwin two days later.[121] Ms. Goodwin responded Dr. Supovitz knew about her concerns with the potential quality of the video if the freelancer was the only employee conducting the video shoot.[122] Ms. Goodwin suggested Dr. Supovitz's decision to remove her from the video shoot despite her concerns "needs to be investigated further as discriminatory action."[123] Ms. Goodwin suggested Chief People Officer Grigore speak with the Consortium's Communications Director Goldhahn who witnessed Ms. Goodwin's and Dr. Supovitz's conversation.[124] Ms. Goodwin suggested Chief People Officer Grigore speak with former Consortium employee Tesla DuBois because Ms. DuBois "witnessed the same sort of hostility towards other employees from [Dr. Supovitz] over the past 5 years."[125]

Chief People Officer Grigore met with Ms. Goodwin and Dr. Supovitz on January 17, 2019.[126] Ms. Goodwin "accused [Dr. Supovitz] several times of discriminating against her because of her disabilities."[127] Chief People Officer Grigore described Ms. Goodwin as "incredibly angry and aggressive in her tone and body language."[128] Dr. Supovitz explained he hired Mr. Crescenzo because Ms. Goodwin "called out for" the November 2018 video shoot.[129] Dr. Supovitz described the work for the video shoot as a "one person job."[130] Dr. Supovitz offered to allow Ms. Goodwin to serve as the second videographer if the other Consortium employees agreed to it.[131] Chief People Officer Grigore described Dr. Supovitz as "visibly angry."[132]

Human Resources Specialist Haas interviewed Communications Director Goldhahn and Mr. Heumiller about Ms. Goodwin on January 23, 2019.[133] Communications Director Goldhahn stated Ms. Goodwin's "delayed" completion of assignments and created a "negative atmosphere" within the Consortium.[134] Communications Director Goldhahn stated Ms. Goodwin "goes at" Dr. Supovitz during team meetings, used an "improper tone" toward Dr. Supovitz, and "expresse[d] herself in unprofessional manners and at times [did] not participat[e] in the [team meeting] conversation."[135] Communications Director Goldhahn said Ms. Goodwin "exaggerate[ed]" her workflow and often completed duplicative work.[136] Ms. Goodwin represented to Dr. Supovitz and Mr. Heumiller she was working on an animations project in December but when Communications Director Goldhahn met with Ms. Goodwin to discuss the project "it was apparent [Ms. Goodwin] had not worked on the project."[137] Mr. Heumiller previously received "rapid fire text messages" from Ms. Goodwin which "appear to be bullying/harassing in nature."[138]

Mr. Heumiller told Human Resources Specialist Haas Ms. Goodwin "create[d] an unnecessary air of tension and hostility."[139] Ms. Goodwin failed to provide "professional quality work" and negatively impacted the Consortium's ability to complete projects and meet deadlines.[140] Ms. Goodwin needed "extremely long periods of time" to complete her work and missed deadlines for her own work "by claiming being occupied with smaller administrative tasks" assigned to other Consortium members.[141] Ms. Goodwin sent Mr. Heumiller "venting emails" complaining she lacked "advance notice" to complete her tasks and used a "condescending . . . unprofessional . . . [and] combative tone."[142] Ms. Goodwin stated she needed one week to complete her portion of the podcast editing but explained to Mr. Heumiller "[t]he bulk of the work takes 5 hours."[143]

Chief People Officer Grigore concluded Ms. Goodwin's complaints about Dr. Supovitz removing Ms. Goodwin from the video shoot did not amount to discrimination.[144]

### Ms. Goodwin requests accommodations for her bipolar disorder and fractured ankle in January 2019 for the second time.

Ms. Goodwin emailed Human Resources Specialist Haas on January 11, 2019 explaining she "need[ed] attend two weekly therapy sessions for [her] disability."[145] Ms. Goodwin said she needed to "schedule Physical Therapy sessions" three times per week in addition to her "weekly therapy sessions."[146] Human Resources Specialist Haas instructed Ms. Goodwin to submit a formal request for accommodation.[147]

Ms. Goodwin submitted her request for accommodation for her bipolar disorder on January 11, 2019.[148] The request covered three hour-long therapy sessions for Ms. Goodwin's bipolar disorder every week for at least six months.[149] Ms. Goodwin submitted her request for accommodation for her fractured ankle on January 11, 2019.[150] The request covered physical therapy three times a week for at least ten weeks.[151]

### Ms. Goodwin rescinds her January 11, 2019 request for accommodation and instead elects for Short Term Disability and medical leave.

Ms. Goodwin requested a leave of absence from the University through the Family and Medical Leave Act on January 15, 2019.[152] The University approved her Short-Term Disability from February 2, 2019 through February 12, 2019.[153] The University also approved Ms. Goodwin's request for leave through the Family and Medical Leave Act on January 29, 2019 to begin on February 13, 2019 through April 25, 2019.[154]

### Ms. Goodwin complains again about Dr. Supovitz.

Dr. Supovitz emailed Ms. Goodwin on January 30, 2019 requesting she log January 9 as a day off in the University's employee system because she attended a doctor appointment and

log January 28 as a day off because she "did not come to work."[155] Ms. Goodwin agreed to log January 9 as a day off but countered she received the videographer equipment "at noon" on January 28 and "work[ed] a full day that carried into the evening."[156] Dr. Supovitz responded Ms. Goodwin's workday "starts at 9am, not noon."[157] Ms. Goodwin countered she worked "into the evening for set-up so the hours make even" and highlighted Mr. Heumiller worked from "10:15 am" on January 30 and left work "around 3."[158] Ms. Goodwin stated Dr. Supovitz's "aggression" about her attendance at work "sounds like retaliation in regards to my leave and [Ms. Goodwin] will consider it as such if it continues."[159]

Ms. Goodwin forwarded her January 30, 2019 exchanges with Dr. Supovitz to Chief People Officer Grigore on February 12, 2019 seeking to submit a formal complaint against Dr. Supovitz.[160] Ms. Goodwin characterized Dr. Supovitz's response requesting she log the day off as "discriminatory and retaliatory" highlighting the conversation occurred "hours after he [was] notified of my leave."[161] Ms. Goodwin stated the University removed her from the University Dropbox blocking her from accessing files after her leave began and stated she "feel[s] that this action may be retaliatory in nature."[162] Chief People Officer Grigore responded stating University employees may lose access to University systems while on medical leave.[163] Chief People Officer Grigore explained to Ms. Goodwin it was "not appropriate" to discuss her complaint about Dr. Supovitz while Ms. Goodwin was on medical leave.[164] Chief People Officer Grigore instructed Dr. Supovitz to not log Ms. Goodwin as out of office on January 28 because Ms. Goodwin "worked but in a different location where [Dr. Supovitz] didn't see her."[165]

### Ms. Goodwin applies for additional medical leave.

Ms. Goodwin applied for additional leave under the Family and Medical Leave Act requesting an extension of her already-granted leave through November 2019.[166] The University

granted Ms. Goodwin's request on April 19, 2019 permitting leave from April 26, 2019 through May 7, 2019.[167] The University informed Ms. Goodwin her twelve week leave allowance under the Family and Medical Leave Act expired on May 7, 2019.[168] The University granted Ms. Goodwin's request for Short Term Disability leave on April 19, 2019 extending her leave from May 7, 2019 through August 5, 2019.[169]

### The University terminates Ms. Goodwin.

The University sent Ms. Goodwin a termination letter on August 5, 2019 effective September 4, 2019.[170] The University attributed her firing to "an examination of the [Consortium's] current organizational structure, budget[,] and business needs."[171] The University did not require Ms. Goodwin to work from August 5, 2019 to September 4, 2019.[172]

The Consortium completed very few videos after firing Ms. Goodwin.[173] The University "phased out" video production following Ms. Goodwin's firing.[174] The Consortium now releases weekly podcasts because it afforded the Consortium "a better chance" of achieving its "main goal" of "secur[ing] funding."[175] Mr. Crescenzo and Mr. Heumiller assumed Ms. Goodwin's responsibilities after her firing.[176]

### Ms. Goodwin sues the University.

Ms. Goodwin sued the University alleging discrimination, retaliation, and harassment under the Americans with Disabilities Act, retaliation under the Family and Medical Leave Act, and discrimination, retaliation, and harassment under the Pennsylvania Human Relations Act.[177] Ms. Goodwin alleges the University discriminated against her because Dr. Supovitz favored her co-worker Mr. Heumiller after learning of Ms. Goodwin's bipolar disorder and fractured ankle and failed to discipline Mr. Heumiller for similar infractions.[178] Ms. Goodwin alleges the University retaliated against her by (1) extending her probationary period after her May 2018

request for accommodations, (2) failing to adjust Ms. Goodwin's workflow while she worked from home because of her fractured ankle, (3) an interaction between Ms. Goodwin and Dr. Supovitz in which Dr. Supovitz left Ms. Goodwin's office with his "fist clenched" causing Ms. Goodwin to be "fearful for her safety," (4) failing to grant Ms. Goodwin's accommodations for transportation to and from work in December 2018, (5) removing Ms. Goodwin from a video shoot in January 2019 shortly after she returned from leave, (6) requiring Ms. Goodwin to log a half day at the end of January 2019 despite her working a full day, and (7) firing her after she returned from medical leave.[179]

## II.    Analysis

The University moves for summary judgment arguing Ms. Goodwin does not establish: (1) a prima facie disability discrimination claim because her ankle fracture is not a disability and Ms. Goodwin does not adduce evidence demonstrating the University fired her because of her bipolar disorder; (2) a prima facie retaliation claim because the University granted all of Ms. Goodwin's requests for accommodation and Ms. Goodwin fails to demonstrate the University engaged in a "pattern of antagonism" as each proffered disagreement with Dr. Supovitz amounted to "petty intra-office squabbles"; and (3) a prima facie Family and Medical Leave Act retaliation claim because her firing occurred several months after Ms. Goodwin's first request for leave.[180] The University argues even if Ms. Goodwin established prima facie disability and retaliation cases, it eliminated the Videographer position because funding concerns and limited engagement with video productions constitute "legitimate, nondiscriminatory" reasons for her termination.[181] The University counters Ms. Goodwin does not demonstrate pretext because she was aware of the Consortium's declining video production and its high costs relative to podcast production, the University did not hire a replacement Videographer, and the University

16

investigated each of Ms. Goodwin's complaints of retaliation and discrimination.[182] The University lastly argues Ms. Goodwin does not create genuine issues of triable fact for her hostile work environment claim because the University's interactions with Ms. Goodwin amounted to "ordinary tribulation of the workplace" and did not constitute severe or pervasive discrimination.[183]

Ms. Goodwin counters her ankle fracture is a disability because it is a "chronic physical impairment" and, alternatively, her ankle was "regarded as" a disability by the University.[184] Ms. Goodwin counters she establishes a prima facie disability discrimination claim through three proffered causal connections: (1) an "unduly suggestive" temporal proximity between the University's knowledge of her disability and her suffering the adverse employment actions of the extension of her probationary period and subsequent termination; (2) the University engaged in a "pattern of antagonism" toward Ms. Goodwin after learning of her disabilities; and (3) the University favorably treated her comparator employees Mr. Crescenzo and Mr. Heumiller.[185]

Ms. Goodwin counters she establishes a prima facie retaliation claim under the Family and Medical Leave Act because the University fired her on her first day back from medical leave.[186] Ms. Goodwin counters the University lacks a "legitimate, nondiscriminatory" reason for firing her because the University did not eliminate her position and because the University employed Ms. Goodwin as a "Video and Podcast Producer" and not a "Videographer."[187] Ms. Goodwin argues the University's decision to eliminate the Videographer position and fire her constituted pretext because her job description "had been redefined for podcasting" and the Consortium continued releasing video projects, her "non-disabled peers" assumed her responsibilities after her firing, and Dr. Supovitz's "intense dislike" of Ms. Goodwin indicated he "more likely than not" based his decision to fire her on her disabilities and complaints to Human

Resources.[188] Ms. Goodwin argues she adduces evidence creating genuine issues of triable facts for her hostile work environment claim because her feeling "bullied, ostracized and physically intimidated by Dr. Supovitz demonstrates the "severe or pervasive" harassment she suffered.[189]

The University replies Ms. Goodwin's failure to adduce evidence other than her own testimony about her ankle prevents us from finding her ankle fracture constitutes a disability.[190] The University argues extension of an employee's probationary period is not an adverse employment action because the extension did not affect the terms and conditions of Ms. Goodwin's employment.[191] The University argues Ms. Goodwin does not adduce evidence her interactions with Dr. Supovitz amounted to more than disagreements about her job performance and she therefore does not demonstrate a "pattern of antagonism" to create genuine issues of triable facts on her disability discrimination and disability retaliation claim.[192] The University argues Ms. Goodwin does not adduce evidence Messrs. Crescenzo and Heumiller are similarly situated to her because Messrs. Crescenzo and Heumiller had different responsibilities than Ms. Goodwin.[193] The University responds Ms. Goodwin does not create genuine issues of triable facts for her Family and Medical Leave Act retaliation claim because the undisputed evidence confirms Dr. Supovitz made the decision to fire her before she applied for leave.[194] The University argues Ms. Goodwin does not demonstrate pretext because Ms. Goodwin, not the University, changed her job position to podcast producer, the Consortium currently engages in very little video product, and no Consortium employees replaced Ms. Goodwin after her firing.[195] The University argues Ms. Goodwin's proffered examples of her "severe or pervasive" harassment for her hostile work environment claim constitute "casual, isolated, or sporadic" incidents concerning her job performance.[196]

We grant the University summary judgment. Ms. Goodwin's ankle fracture is not an "actual" or "perceived" disability under the Americans with Disabilities Act. Ms. Goodwin does not establish a prima facie disability discrimination claim because she has not adduced evidence creating genuine issues of triable fact her bipolar disorder was the determinative factor in her firing. Ms. Goodwin does not establish a prima facie retaliation claim because she does not adduce evidence she experienced a pattern of antagonism related to her complaints to Human Resources and requests for accommodation. Ms. Goodwin does not establish a Family and Medical Leave Act retaliation claim because the temporal proximity between her expiration of leave and firing is not unusually suggestive. Even if we found Ms. Goodwin established prima facie disability discrimination and retaliation claims, we find the University possessed legitimate nondiscriminatory reasons for firing Ms. Goodwin owing to the expense of and limited engagement with video productions. Ms. Goodwin then does not adduce evidence allowing us to disbelieve the University's legitimate nondiscriminatory reasons for firing her and Ms. Goodwin does not adduce evidence Messrs. Crescenzo and Heumiller are similarly situated to her. And Ms. Goodwin does not adduce evidence creating genuine issues of triable facts she suffered from a severe or pervasive environment of harassment because none of her complained interactions with Dr. Supovitz concern her bipolar disorder.

### A. Ms. Goodwin does not adduce evidence allowing prima facie findings of discrimination, retaliation, and Family and Medical Leave Act retaliation.

The University argues Ms. Goodwin fails to adduce evidence creating a genuine issue of triable fact she establishes prima facie discrimination, retaliation, and Family and Medical Leave Act retaliation claims.[197] The University argues Ms. Goodwin's ankle fracture is not an actual or perceived disability under the Americans with Disabilities Act, the University did not fire Ms. Goodwin because of her bipolar disorder, the University did not engage of a pattern of

antagonism toward Ms. Goodwin, and the University fired Ms. Goodwin several months after she took leave under the Family and Medical Leave Act.[198]

Ms. Goodwin counters she establishes prima facie discrimination, retaliation, and Family and Medical Leave Act retaliation claims.[199] Ms. Goodwin argues she establishes a prima facie disability discrimination case concerning her ankle fracture because it substantially impacts several major life activities and the University knew about her ankle fracture, she establishes a prima face disability discrimination claim concerning her bipolar disorder because there is temporal proximity between the University learning about her bipolar disorder and its decision to fire her, the University engaged in a pattern of antagonism after learning about her bipolar disorder, and the University treated similarly situated non-disabled employees more favorably, she establishes a prima facie retaliation claim because there exists temporal proximity between her protected activity and firing and a pattern of antagonism ensued after her protected activity, and she established a prima face Family and Medical Leave Act retaliation claim because there exists temporal proximity between her Family and Medical Leave Act leave and her firing.[200]

We find Ms. Goodwin does not adduce evidence establishing prima facie disability discrimination, retaliation, and Family and Medical Leave Act claims.

## 1. Ms. Goodwin does not adduce evidence creating a genuine issue of triable fact her fractured ankle is a disability.

The University argues Ms. Goodwin's ankle fracture does not constitute a disability because she adduces no evidence other than her testimony demonstrating the fracture substantially limits a major life activity.[201] The University argues Ms. Goodwin's ankle fracture was transitory and minor and cannot be regarded as a disability under the Americans with Disabilities Act, as amended, because she sought treatment for only six months.[202] Ms. Goodwin counters her ankle fracture is a disability because it continues to impact her ability to crouch

down and walk which are major life activities as defined by Congress in the Americans with Disabilities Act.[203] Ms. Goodwin argues she suffers from chronic ankle pain.[204] Ms. Goodwin counters she need only adduce evidence the University was aware of her ankle fracture to create genuine issues of triable facts the University regarded her as disabled.[205]

We grant the University summary judgment on Ms. Goodwin's discrimination and harassment claims concerning her ankle finding Ms. Goodwin adduces no evidence, other than her feelings and opinions, allowing us to find she creates a genuine issue of triable fact her fractured ankle for a limited period constitutes a disability.

Congress requires employees alleging discrimination or harassment claims under the Americans with Disabilities Act adduce evidence of their disability.[206] Congress defines "disability" as "(A) a physical or mental impairment that substantially limits one or more major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment."[207] An impairment is "regarded as" a disability "if the individual establishes that he or she has been subjected to an action prohibited under this chapter because of an actual or perceived physical or mental impairment whether or not the impairment limits or is perceived to limit a major life activity."[208] Congress exempts "transitory and minor" impairments "with an actual or expected duration of 6 months or less" from being considered "regarded as" disabilities.[209] Our Court of Appeals instructs a fracture causing two months "lost use" of other body parts is "transitory and minor" and not a "perceived" disability under section 12102(1)(C).[210]

We are guided by Judge Goldberg's reasoning in granting summary judgment to the United States Postal Service where a postal support employee suffered a fractured ankle requiring treatment and follow-up visits for eleven months.[211] The employee in *Brearey* fractured

his ankle and received treatment for two months before undergoing surgery.[212] The employee used walking aids for seven months after the injury.[213] The employee's orthopedic specialist stated the employee had "good range of motion to the ankle" in the employee's final visit to the specialist eleven months after sustaining the injury.[214] The Postal Service fired the employee because he required crutches for up to eight weeks following his fracture.[215] The employee argued he suffered an actual disability because his fracture "substantially impaired his ability to stand and walk at times" and a perceived disability because the Postal Service "regarded [the postal support employee] as" disabled.[216] Judge Goldberg granted the Postal Service summary judgment finding the employee did not suffer an actual disability because the employee's physician concluded the employee had "good range of motion to the ankle" and the employee's "testimony that he has continued pain and cannot run due to his ankle condition is insufficient to establish a disability."[217] Judge Goldberg concluded the employee also did not suffer a perceived disability because the employee's six-to-eight week inability to work was objectively transitory and minor despite continued treatment and doctor visits for nearly one year after sustaining the fracture.[218]

Physician prognoses of limitations in completing major life activities can create genuine issues of triable fact concerning an employee's alleged disability.[219] The nursing assistant in *McMullen* fractured his ankle in October and his physician cleared him to return to work and to use a walker in January.[220] The nursing assistant's physician wrote a note requesting the nursing assistant be limited to "6-8 hours" of work per day.[221] These work limitations and instructions to use walking aids were "open-ended with no definitive end date."[222] Judge Rambo denied summary judgment to the employer finding the physician's restrictions of the nursing assistant's movement and request the nursing assistant be afforded the ability to work with walking aids for

an indeterminate amount of time created genuine issues of triable facts as to the nursing assistant's disability.[223]

Ms. Goodwin's ankle injury is like the one the postal support employee suffered in *Brearey*. Ms. Goodwin fractured her ankle in November 2018.[224] She returned to in-person work two months later.[225] She completed a very brief stint of physical therapy.[226] Ms. Goodwin swore her ankle "impact[s]" her ability to do yoga, ride a bicycle, crouch down, and walk but does not currently see a physician for her ankle injury.[227] Like the postal support employee in *Brearey*, Ms. Goodwin fails to adduce evidence other than her own testimony her ankle substantially limited a major life activity.[228] And like the postal employee in *Brearey*, Ms. Goodwin did not work in-person for nearly two months after her surgery. We cannot take Ms. Goodwin at her word at this stage of the litigation without adduced evidence showing us her ankle substantially limits a major life activity. We are guided by Judge Goldberg's reasoning in *Brearey* granting summary judgment to the Postal Service despite the conflict between employee's physician's positive prognosis and the employee's testimony of continued ankle pain. Ms. Goodwin only adduced her testimony. Ms. Goodwin's ankle fracture is not an actual disability under the Americans with Disabilities Act.

We similarly find Ms. Goodwin's ankle fracture does not constitute a perceived disability because she returned to work within two months of the fracture. Our Court of Appeals instructs a two-month injury due to fracture is insufficient to create a genuine issue of triable fact the employee suffered "perceived" disability.[229] Ms. Goodwin's injury is dissimilar to the nursing assistant in *McMullen* because Ms. Goodwin adduces no evidence the injury extended beyond a six-month period. The nursing assistant in *McMullen* displayed "open-ended" limitations in "walking, standing, and lifting" recognized by his physician.[230] The nursing assistant in

*McMullen* presented physician's notes instructing he be allowed to use either a walker or cane upon return to work.[231] Ms. Goodwin adduces no evidence limitations or restrictions related to her ankle fracture extended beyond the two months between her surgery and return to work. She used a motorized scooter in January 2019 but adduced no evidence her physician required she use this walking aid.[232] Ms. Goodwin instead tells us her injury lasted longer than six months. We need more than her say-so to find a genuine issue of triable fact she is perceived as disabled because of her ankle fracture under the Americans with Disabilities Act.

Ms. Goodwin's ankle fracture is neither an actual nor perceived disability under the Americans with Disabilities Act. We grant the University summary judgment on Ms. Goodwin's discrimination and harassment claims under the Americans with Disabilities Act predicated on her ankle fracture.

### 2. Ms. Goodwin does not adduce evidence of triable facts the University discriminated against her because of her bipolar disorder.

The University argues Ms. Goodwin fails to adduce evidence establishing a prima facie disability discrimination claim because the University fired her long after learning of her bipolar disorder.[233] Ms. Goodwin counters the University fired her soon after learning of her disabilities.[234] But, she counters, even if the temporal proximity between her firing and the University's knowledge of her disabilities is not unusually suggestive, she adduced evidence of a pattern of antagonism sufficient to create a causal nexus, and failing these two proffered examples, Ms. Goodwin argues a causal connection because the University treated similarly situated employees more favorably than it treated her.[235]

We find Ms. Goodwin does not establish a prima facie disability discrimination claim because she does not adduce evidence raising a genuine issue of triable fact the University used her bipolar disorder as the determinative factor in her firing.

Ms. Goodwin alleges a disparate treatment claim of disability discrimination. Our Court of Appeals instructs we should apply the *McDonnell Douglas* burden-shifting framework to disability discrimination claims.[236] Employees alleging disability discrimination claims must first establish a prima facie claim of disparate treatment.[237] The burden then shifts to the employer to adduce evidence it fired the employee for a legitimate, nondiscriminatory reason.[238] The burden then shifts back to the employee to adduce evidence the employer's legitimate, nondiscriminatory reason constituted pretext for discriminatory intent.[239] While the burden of production switches at each stage of the *McDonnell Douglas* framework, the ultimate burden of persuading the jury the employer intentionally discriminated against the employee remains at all times with the employee.[240]

### i. Ms. Goodwin did not show a causal connection between her firing and her disability.[241]

A plaintiff establishes a prima facie disability discrimination claim by showing "(1) [she] is a disabled person within the meaning of the [Americans with Disabilities]; (2) [she] is otherwise qualified to perform the essential functions of the job, with or without reasonable accommodations by the employer; and (3) [she] has suffered an otherwise adverse employment decision as a result of discrimination."[242]

The University contests only the third element of the prima facie analysis concerning Ms. Goodwin's bipolar disorder.[243] The University argues Ms. Goodwin's ankle fracture is not a disability but if we find Ms. Goodwin adduced evidence her ankle fracture constitutes a disability, which we do not, Ms. Goodwin fails to adduce evidence demonstrating the University fired her because of her ankle fracture.[244]

An adverse employment action is an employer's decision which is "serious and tangible enough to alter an employee's compensation, terms, conditions, or privileges of employment."[245]

An employee can show a causal connection between the employer learning of the employee's disability and the adverse employment action if there is an unduly suggestive temporal proximity between the two events.[246] An employee can show causation in a disability discrimination claim by adducing evidence the employer considered the employee's disability a determinative factor in the employee's adverse employment action.[247]

We conclude the University's firing Ms. Goodwin is the only actionable adverse employment action. Mr. Goodwin cannot rely on Dr. Supovitz's January 2019 decision to eliminate the Videographer position.  The January 2019 decision did not affect the terms or conditions of Ms. Goodwin's employment. Ms. Goodwin remained employed for the eight months following Dr. Supovitz's January 2019 decision to eliminate her position.[248] Ms. Goodwin also does not direct us to authority suggesting an employer extending an employee's probationary period constitutes an adverse employment action. Ms. Goodwin does not adduce evidence the University's extension of her probationary period altered the terms, conditions, or compensation of her position as Videographer. She only "felt" the extension amounted to discrimination.[249] Say-so conclusions and feelings unsupported by law do not create genuine issues of triable facts absent some form of corroborative evidence.

### a. Ms. Goodwin cannot show temporal proximity between the University learning of her bipolar disorder and her termination.

The University argues Ms. Goodwin fails to adduce evidence of temporal proximity between the University learning of Ms. Goodwin's bipolar disorder and terminating Ms. Goodwin's employment.[250] Ms. Goodwin cites a short period of time between her disclosing her bipolar disorder and the University extending her probationary period.[251] Ms. Goodwin counters there exists a short period of time between her ankle fracture and the alleged adverse

employment action of Dr. Supovitz eliminating the Videographer position.[252] We cannot find temporal proximity sufficient to establish a prima facie disability discrimination case because sixteen months passed between Ms. Goodwin disclosing her bipolar disorder to Dr. Supovitz and the University terminating her employment. The extension of her probationary period and Dr. Supovitz's January 2019 decision to eliminate the Videographer position are not adverse employment actions.

An employee establishes causation for prima facie disability discrimination if she adduced evidence of a temporal proximity between the employer's knowledge of the employee's disability and the adverse employment action.[253] Our Court of Appeals considers a time gap of two months or longer between the employer learning of the employee's disability and the adverse employment action fatal to a prima facie disability discrimination case.[254]

We find Ms. Goodwin fails to demonstrate temporal proximity between the University learning of her bipolar disorder and the University firing her. Ms. Goodwin swore she informed Dr. Supovitz of her bipolar disorder in April 2018.[255] The University terminated Ms. Goodwin sixteen months after this disclosure. This time gap far exceeds the two months our Court of Appeals held insufficient to establish a prima facie disability discrimination claim.

And even if we could find Ms. Goodwin's ankle fracture constitutes a disability, we find there is no temporal proximity between Ms. Goodwin's ankle fracture and her firing. Ms. Goodwin fractured her ankle in November 2018. The University terminated Ms. Goodwin's employment nine months later, again greater than the two-month time gap our Court of Appeals held insufficient to establish a prima facie disability discrimination case.

### b. Ms. Goodwin cannot show her bipolar disorder was the University's determinative factor in terminating her.

The University argues Ms. Goodwin fails to adduce evidence the University considered her bipolar disorder the requisite determinative factor in her firing because Ms. Goodwin acknowledged the diminished Videographer workload.[256] Ms. Goodwin argues she experienced ongoing antagonism after the University learned of her disabilities and Dr. Supovitz treated similarly situated employees more favorably than he treated her because of her disabilities.[257] Ms. Goodwin does not address whether her disabilities were the determinative factor in the University's decision to terminate her employment.[258] We find Ms. Goodwin does not adduce evidence her bipolar disorder constituted a determinative factor in the University's decision to terminate her employment.

Our Court of Appeals allows employees alleging disability discrimination claims to demonstrate causation for their prima facie case by adducing evidence their disability was a determinative factor in the decision to terminate the employee.[259] Our Court of Appeals held an employee's knowledge of their potential firing unrelated to the employee's disability can undermine the employee's ability to create a genuine issue of triable fact their disability was the determinative factor in the decision.[260]

We are guided by Judge Marston granting summary judgment to a packaging company after the material handler employee failed to adduce evidence his employer viewed his diabetic condition as a determinative factor in his firing.[261] The material handler in *Campo* suffered from diabetes requiring him to take frequent breaks during working hours to monitor his blood sugar.[262] The packaging company issued the material handler several notices of violating company policy by taking unauthorized breaks, wearing jewelry on the work floor, and failure to follow instructions.[263] The packaging company fired him twice for violating company policy.[264] The material handler sued the packaging company alleging disability discrimination.[265] Judge

Marston granted the packaging company summary judgment finding even though some of the material handler's policy violations constituted unapproved breaks allegedly related to the material handler's diabetic condition, other violations "[were] entirely unrelated" to taking breaks for his diabetic condition.[266] Judge Marston also concluded none of the violations before the material handler's second firing concerned breaks therefore preventing the material handler from creating a genuine issue of material fact his diabetic condition was a determinative factor in the employer's decision to terminate the material handler's employment.[267]

Ms. Goodwin adduces less evidence the University used her bipolar disorder as a determinative factor in its decision to terminate her than did the material handler in *Campo*. Ms. Goodwin knew the Videographer position had little video production responsibilities by October 2018.[268] Ms. Goodwin conceded the University could eliminate her position because of the declining video production responsibilities seven months before the University ultimately fired her.[269] Ms. Goodwin's acknowledgement she might be fired for reasons unrelated to her bipolar disorder far in advance of her eventual firing undermines her ability to adduce evidence the University used her bipolar disorder as a determinative factor in the University's decision to terminate her employment.[270]

But Ms. Goodwin fails to adduce evidence the University used her bipolar disorder as a determinative factor. She instead relies on her own conclusions and feelings.[271] Dr. Supovitz suggested eliminating Ms. Goodwin's position because of declining video production and its expense.[272] The University attributed her firing to "an examination of the [Consortium's] current organizational structure, budget[,] and business needs."[273] Ms. Goodwin offers no evidence refuting these assertions. Ms. Goodwin instead suggests the University fired her because of her bipolar disorder. Unsupported allegations do not suffice today. We cannot manufacture a genuine

dispute as to why the University fired Ms. Goodwin without evidence countering the Consortium's demonstrated legitimate business and budgetary needs.

Ms. Goodwin does not establish a prima facie disability discrimination claim because she adduced no evidence the University used her bipolar disorder as a determinative factor in deciding to terminate her employment.

### 3. Ms. Goodwin does not create genuine issues of triable fact the University retaliated against her for requesting accommodations or complaining to Human Resources about Dr. Supovitz.

The University argues Ms. Goodwin also cannot establish a prima facie retaliation case. The University argues a lack of temporal proximity between her requests for accommodations and her complaints to Human Resources about Dr. Supovitz because the University terminated her nearly nine months after this protected activity and Ms. Goodwin fails to adduce evidence she suffered a pattern of antagonism because her allegedly negative interactions with Dr. Supovitz and the Consortium's employees amount to "petty intra-office squabbles."[274] Ms. Goodwin counters she establishes a prima facie retaliation claim because of the unusually suggestive temporal proximity between her request for accommodations in April 2018 and the University's extension of her probationary period and she experienced a pattern of antagonism after she disclosed her bipolar disorder to Dr. Supovitz demonstrated by his "cold, abusive and aggressive" treatment of Ms. Goodwin, his "disregard" and "lack of respect" for her work and workflow, and "physical intimidation" of her.[275]

Ms. Goodwin does not establish a prima facie retaliation claim. She does not adduce evidence demonstrating temporal proximity between her requests for accommodation and her complaints to Human Resources and the University's August 2019 decision to terminate her employment. She does not adduce evidence creating a genuine issue of triable fact the University

engaged in a pattern of antagonism after she began requesting accommodation and complaining to Human Resources.

Retaliation claims brought under the Americans with Disabilities Act require the employee first demonstrate a prima facie case of retaliation. We apply the same *McDonnell Douglas* burden shifting framework employed in our disability discrimination analysis to Ms. Goodwin's retaliation claims.[276]

### i. Ms. Goodwin does not adduce evidence of a causal connection between her protected activity and the University's decision.

An employee establishes a prima facie retaliation claim by adducing evidence she engaged in a "(1) protected employee activity; (2) adverse action by the employer either after or contemporaneous with the employee's protected activity; and (3) a causal connection between the employee's protected activity and the employer's adverse action."[277] The University only challenges the causal connection factor in Ms. Goodwin's prima facie retaliation claim.[278]

Both internal complaints about discrimination and requests for accommodation are protected activity under the Americans with Disabilities Act.[279] An employee does not need to plead a disability to proceed to trial on a claim for retaliation under the Americans with Disabilities Act.[280] We are guided by our Court of Appeals's instruction in *Krouse* and evaluate Ms. Goodwin's retaliation claims and consider requests for accommodation for both her ankle fracture and bipolar disorder even though we find Ms. Goodwin's ankle fracture does not constitute an actual or perceived disability.

### a. Ms. Goodwin does not show temporal proximity between her protected activity and her firing.

The University argues Ms. Goodwin fails to adduce evidence of temporal proximity because of the "well over a year" gap between her protected activity and firing.[281] Ms. Goodwin

counters she requested accommodations for her bipolar disorder in April 2018 and the University extended her probationary period one month after her request, and Ms. Goodwin requested accommodations for her ankle fracture in November 2018 and Dr. Supovitz first considered eliminating her position in December 2018.[282] But these are not adverse employment actions. Ms. Goodwin does not adduce evidence of temporal proximity between her protected activities of requests for accommodation for her ankle fracture and bipolar disorder and her firing because only the University's decision to terminate her is an adverse employment action.

Employees alleging retaliation claims under the Americans with Disabilities Act can demonstrate a causal connection sufficient to establish a prima facie retaliation claim by showing temporal proximity between their engaged protected activity and an adverse employment action by their employer.[283] The time between the employee's protected activity and their firing must be unusually suggestive.[284] Our Court of Appeals instructs an adverse employment action greater than two months after protected activity fails to establish a causal connection sufficient to make out a prima facie retaliation claim.[285]

Ms. Goodwin cannot demonstrate temporal proximity between her protected activity and her August 2019 firing. Ms. Goodwin requested accommodations for her ankle and bipolar disorder in April 2018, November 2018, December 2018, and January 2019.[286] Ms. Goodwin complained to Human Resources about Dr. Supovitz in October 2018, January 2019, and February 2019.[287] None of these instances of protected activity are within several months of Ms. Goodwin's firing. Firing Ms. Goodwin's in August 2019 is not unusually suggestive of retaliation considering the several month time gap.

   **b. Ms. Goodwin does not adduce evidence the University engaged in a pattern of antagonism toward her after she engaged in protected activity.**

The University argues Ms. Goodwin's difficulties with Dr. Supovitz do not amount to a pattern of antagonism and instead constitute "petty intra-office squabbles" our Court of Appeals does not consider actionable.[288] Ms. Goodwin counters Dr. Supovitz's "claim[]" Ms. Goodwin left early and arrived late to work, "cold, abusive and aggressive" treatment of Ms. Goodwin, "lack of respect" and "acknowledgement" of Ms. Goodwin's work contributions, "physical intimidation," "disregard[]" for her workflow," and "demand[]" she return to work in person despite her ankle fracture demonstrated an actionable pattern of antagonism connecting her protected activity to her firing.[289] But Ms. Goodwin again does not adduce evidence Dr. Supovitz engaged in a pattern of antagonism sufficient to establish a prima facie retaliation claim.

Our Court of Appeals instructs employees may demonstrate a causal connection between their protected activity and adverse employment action by showing a pattern of antagonism exhibited by the employer after the employee engaged in protected activity.[290] Colleagues grant summary judgment for the employer when the employee's "subjective beliefs" are the "sole evidence" supporting the employee's retaliation claim.[291]

We are guided by the contrasts offered by our Court of Appeals in *Robinson* holding a supervisor's "verbal abus[e]" toward an employee following protected activity constitutes an actionable pattern of antagonism.[292] The bus cleaner in *Robinson* complained to his supervisor a co-worker made a racially offensive remark.[293] The supervisor became "verbally abusive" during his conversation with the bus cleaner about the alleged remark.[294] The bus cleaner filed a union grievance following the conversation.[295] The bus cleaner's relationship with his supervisors then "deteriorated sharply" and the bus cleaner received "repeated[] discipline[e] for minor matters, miscalculating his points for absences from work, and generally trying to provoke [the bus cleaner] to insubordination."[296] Our Court of Appeals held the "constant barrage of written and

33

verbal warnings" following the bus cleaner's union grievance amounted to a pattern of antagonism.[297]

Another contrast arises with adduced evidence of a physical assault of the complaining employee which can demonstrate a pattern of antagonism.[298] The police officer in *Moore* complained his supervising officer repeatedly used racial slurs toward black officers and complained other officers labeled the police officer a "rat" and a "snitch."[299] Three months after complaining, the police officer overheard his supervisor threaten assaulting the complaining police officer.[300] Another police officer assaulted the complaining officer fifteen minutes after the complaining officer overheard his supervisor threaten to assault the complaining officer.[301] Our Court of Appeals held the assault following the complaint constituted retaliatory animus sufficient to establish causal connection for the complaining officer's prima facie retaliation claim.[302]

But not all discomfort in the workplace is antagonism.  For example, "petty intra-office squabbles" between a supervisor and an employee following the employee's engagement in protected activity do not evidence a pattern of antagonism sufficient to establish a prima facie retaliation claim.[303] The employer in *Martinez* hired an attorney to manage its immigration services.[304] The attorney and a supervisor engaged in a heated exchange about processes in the immigration services department.[305] A different supervisor made suggestive comments to the attorney and her assistant.[306] Our Court of Appeals held the disagreement about workplace processes and the suggestive comments amounted to nothing more than "petty intra-office squabbles" and affirmed Judge Conti's grant of summary judgment for the employer.[307]

We are also guided by Chief Judge Hornak's grant of summary judgment to an employer hospital system where the complaining physician adduced evidence his supervising physician

opposed his promotion and demonstrated hostility toward the complaining physician.[308] The physician in *Patel* alleged age discrimination after the hospital system promoted a younger physician to full-time employment.[309] The supervising physician opposed the complaining physician's promotion and made his hostility toward the complaining physician "clear."[310] The complaining physician testified his supervisor would "use all his power" to prevent him from being promoted to full-time employment.[311] Chief Judge Hornak described the workplace tension between the complaining physician and his supervisor as being "quite palpable."[312] Chief Judge Hornak still held "interpersonal workplace strife" is insufficient to demonstrate a pattern of antagonism necessary to establish a prima facie retaliation claim.[313]

Ms. Goodwin's complaints about Dr. Supovitz concerning their October 2018 interaction are more like the "interpersonal workplace strife" Chief Judge Hornak held insufficient to establish a prima facie case than the assault in *Moore* and verbal abuse in *Robinson*. Ms. Goodwin's October 2018 complaint against Dr. Supovitz derives from a conversation in which Dr. Supovitz questioned whether Ms. Goodwin arrived to work late and left early.[314] Chief People Officer Grigore's notes from her meeting with Ms. Goodwin discussing the October 2018 interaction explain Ms. Goodwin feared Dr. Supovitz would yell at her and "his fists were clenched [and] he was red" when leaving their interaction.[315] Ms. Goodwin admitted Dr. Supovitz did not scream at her during the interaction.[316] Ms. Goodwin told Chief People Officer Grigore the interaction with Dr. Supovitz did not concern her medical leave and instead concerned a "normal work-type problem."[317] Even reading these facts in Ms. Goodwin's favor as we must, we find Dr. Supovitz's behavior falls short of actionable antagonism.[318] Dr. Supovitz did not yell at Ms. Goodwin or verbally abuse her as the supervisor did in *Robinson*. Even if Dr. Supovitz did yell at Ms. Goodwin, our Court of Appeals in *Martinez* held a heated exchange

between employee and her supervisor about workplace processes amounts only to a "petty intra-office squabble" and is not actionable antagonism. Dr. Supovitz allegedly clenched his fists but he neither threatened nor assaulted Ms. Goodwin unlike the police officer in *Moore*. The interaction stemmed from her attendance at work. Their interaction is closer to the "interpersonal workplace strife" Chief Judge Hornak considered in *Patel* than it is to verbal or physical abuse considered by our Court of Appeals in *Robinson* and *Moore*. We find no pattern of antagonism based on this interaction.

Ms. Goodwin's January 2019 complaints about Dr. Supovitz are also like those in *Patel* demonstrating workplace strife and not verbal abuse. Dr. Supovitz removed Ms. Goodwin from a video shoot occurring at the end of January 2019 because he worried she may injure herself as video equipment wiring could create a "hazardous environment for somebody with a scooter."[319] Ms. Goodwin quickly and broadly characterized Dr. Supovitz's decision as "discrimination."[320] Ms. Goodwin told Chief People Officer Grigore she thought Dr. Supovitz based his decision removing her from the video shoot on her disclosure of bipolar disorder but admitted she "ha[d] no reason" for this belief and herself characterized it as "just [her] assumption."[321] The University's Human Resources department investigated Ms. Goodwin's complaint and determined Dr. Supovitz's decision did not amount to discrimination.[322] The Human Resources department interviewed several of Ms. Goodwin's colleagues and they described Ms. Goodwin as creating a "negative" atmosphere within the Consortium and "an unnecessary air of tension and hostility."[323] Ms. Goodwin again fails to adduce evidence allowing us to consider Dr. Supovitz's decision to remove her similar to the verbal or physical abuse in *Robinson* and *Moore*. His concern for her safety could hardly be categorized as even the type of "interpersonal

workplace strife" Chief Judge Hornak found unactionable in *Patel*. We find no pattern of antagonism based on this interaction.

Ms. Goodwin's February 2019 complaints about Dr. Supovitz similarly fall short of the antagonism recognized in *Robinson* and *Moore*. Ms. Goodwin complained to Chief People Officer Grigore Dr. Supovitz requested she log a day off because she allegedly did not come to work.[324] Ms. Goodwin and Dr. Supovitz exchanged emails about her attendance at work culminating with Ms. Goodwin characterizing Dr. Supovitz's responses as "aggression" and she considered it "retaliation in regards to my [medical] leave."[325] Chief People Officer Grigore instructed Dr. Supovitz to mark Ms. Goodwin as present at work because she worked in a different location.[326] Asking an employee to comply with the employer's work policy is not verbal abuse. Ms. Goodwin's February 2019 complaints fall similarly short of the recognized patterns of antagonism in *Robinson* and *Moore*.

We recognize the dynamic and unique nature of each employment relationship. We are not suggesting Ms. Goodwin needs to meet a cookie-cutter antagonism. But the guidance from our Court of Appeals and colleagues offers guideposts. Ms. Goodwin and Dr. Supovitz did not get along during her tenure. But interpersonal friction is not a pattern of antagonism as acknowledged by Chief Judge Hornak in *Patel*. Ms. Goodwin cannot manufacture a pattern of antagonism sufficient to establish a causal connection for her retaliation claim simply by quickly concluding her interactions with Dr. Supovitz are "discrimination" and "retaliation" for taking medical leave. Ms. Goodwin does not adduce evidence of an actionable pattern of antagonism exhibited by Dr. Supovitz.

**4.  Ms. Goodwin does not adduce evidence the University retaliated against her for taking leave under the Family and Medical Leave Act.**

The University argues Ms. Goodwin fails to establish a prima facie retaliation claim under the Family and Medical Leave Act because she cannot show temporal proximity between her first request for leave under the Act and her firing.[327] Ms. Goodwin counters she establishes a prima facie retaliation claim because the University's decision to terminate her on her first day back at work demonstrates causation as a matter of law.[328] We find Ms. Goodwin does not adduce evidence the University retaliated against her for taking leave under the Family and Medical Leave Act because her statutorily-protected leave expired several months before the University decided to terminate her employment in early August 2019.

Like disability discrimination and the retaliation claims, employees alleging retaliation claims under the Family and Medical Leave Act must first establish a prima facie case.[329] Family and Medical Leave Act retaliation claims follow the same *McDonnell Douglas* burden-shifting analysis as disability discrimination and retaliation claims.[330]

An employee establishes a prima facie Family and Medical Leave Act retaliation claim by adducing evidence: "(1) she invoked her right to FMLA-qualifying leave, (2) she suffered an adverse employment decision, and (3) the adverse action was causally related to her invocation of rights."[331] Our Court of Appeals permits employees to show causation through "either (1) an unusually suggestive temporal proximity between the protected activity and the allegedly retaliatory action, or (2) a pattern of antagonism coupled with timing to establish a causal link."[332] Temporal proximity is "unusually suggestive" if it is less than a week between the employee's exercise of their Family and Medical Leave Act rights and the adverse employment decision.[333] Our Court of Appeals assesses temporal proximity "from the first date on which the litigant engaged in [her] protected activity."[334]

Ms. Goodwin fails to adduce evidence creating a genuine issue of triable fact the temporal proximity between her applying for medical leave and the University firing her is unusually suggestive. Ms. Goodwin first requested leave under the Family and Medical Leave Act on January 15, 2019.[335] The University decided to terminate Ms. Goodwin's employment on August 5, 2019.[336] The University's decision is not temporally proximate to her first application for leave under the Family and Medical Leave Act. Ms. Goodwin returned from Short-Term Disability the same day she received her termination letter after her leave under the Family and Medical Leave Act expired on May 7, 2019.[337] Ms. Goodwin does not demonstrate causation sufficient to establish a prima facie Family and Medical Leave Act retaliation claim.[338]

**B. Ms. Goodwin does not demonstrate pretext even if we could find a prima facie case.**

Even though Ms. Goodwin does not adduce evidence allowing us to find some basis for prima facie disability discrimination, retaliation, and Family and Medical Leave Act retaliation, we assess whether the University demonstrates a legitimate, nondiscriminatory reason for firing Ms. Goodwin and whether Ms. Goodwin adduced evidence allowing us to find genuine issues of material facts for a jury to find her firing was pretextual.  We find she does not adduce evidence of disputed issues of material fact on pretext.

**1. The University adduces evidence of legitimate, nondiscriminatory reasons for firing Ms. Goodwin.**

Once a disability discrimination employee establishes a prima facie case, the burden shifts to the employer to adduce evidence the employer had a "legitimate, nondiscriminatory" reason for firing the employee.[339] Judges consistently hold a financial reason for firing an employee alleging discrimination constitutes a legitimate nondiscriminatory reason.[340]

Eliminating a role rendered "[un]necessary" because it completes duplicative functions is also a legitimate, nondiscriminatory reason for firing an employee.[341]

The University argues the decline in video production and the high cost of video production relative to podcast production constitute legitimate nondiscriminatory reasons for firing Ms. Goodwin.[342] Ms. Goodwin counters the University lacks a legitimate, nondiscriminatory reason for firing her because her role changed from "Videographer" to "Video and Podcast Producer."[343] We find the decline in video production, the main responsibility of the Videographer position, and the University Consortium's financial reasons necessitating the shift toward podcast production are legitimate nondiscriminatory reasons for Ms. Goodwin's firing.

The University's financial reasons for deciding to terminate Ms. Goodwin's employment and eliminate the Videographer role are legitimate and nondiscriminatory.[344] Video production cost the Consortium "considerably more" than podcast production.[345] The Consortium disclosed it needed to be cost-conscious as it relies on external funding.[346] The University's decision to eliminate the Videographer role and focus more on podcasting because podcasting generated more interest in the Consortium's projects is legitimate and nondiscriminatory. Video viewership started declining in 2018 while podcast listenership began increasing in 2018.[347]

> ## 2. Ms. Goodwin does not adduce evidence creating a genuine issue of triable fact the University's reasons for terminating her employment were pretextual.

The University argues Ms. Goodwin fails to adduce evidence creating a genuine issue of triable fact of pretext in its decision to terminate Ms. Goodwin's employment. It argues she does not adduce evidence rebutting the University's legitimate nondiscriminatory reasons for deciding to terminate her and does not adduce evidence the University demonstrated discriminatory or retaliatory animus towards her.[348] Ms. Goodwin counters we should simply disbelieve the

University's proffered legitimate, nondiscriminatory reasons for firing her because her job "had been redefined for podcasting" and the Consortium continues to complete videography work.[349] Ms. Goodwin further counters Dr. Supovitz's "intense dislike" once her "disabilities became an annoyance to him" demonstrates it is more likely than not the University fired her because of her disability.[350]

Ms. Goodwin fails to adduce evidence creating a genuine issue of triable fact the University's proffered legitimate and nondiscriminatory reasons for firing her served as pretext because Ms. Goodwin does not adduce evidence why we should disbelieve the University and does not adduce evidence demonstrating it is more likely than not the University fired her because of her disabilities. Ms. Goodwin also does not adduce evidence creating a genuine issue of material fact as to whether Mr. Crescenzo and Mr. Heumiller are similarly situated employees.

Once the employer adduces evidence of its legitimate, nondiscriminatory reasons for firing the employee, the burden shifts back to the employee to demonstrate these proffered reasons are pretext.[351] Ms. Goodwin cannot rely on generalized, subjective beliefs the University discriminated against her to create genuine issues of triable facts.[352]

The employee must "point to some evidence, direct or circumstantial, from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action."[353] But Ms. Goodwin cannot argue the University's decision was wrong or mistaken to satisfy the first prong. She must instead demonstrate such "inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence."[354]

Ms. Goodwin could demonstrate invidious discrimination by adducing evidence "[she] has previously been discriminated against by the [University]; (2) the [University] has discriminated against other persons with disabilities; or (3) the [University] has treated similarly situated persons without a disability more favorably."[355] It is Ms. Goodwin's burden to adduce evidence "potential comparators are indeed similarly situated" and her own "unsupported statements regarding the comparators' circumstances will not suffice."[356] Our Court of Appeals instructs we consider the purported comparators' job responsibilities when assessing whether they are similarly situated to Ms. Goodwin.[357]

Ms. Goodwin asks we disbelieve the University's reasons for firing her because the Consortium still produces video and produces weekly podcasts within Ms. Goodwin's skill set.[358] But Ms. Goodwin mischaracterizes the Consortium's output and the fact it hired her to be a *Videographer* and not a *Podcast Producer*. Mr. Heumiller swore the Consortium produced very few videos after firing Ms. Goodwin.[359] We have no contrary evidence. Ms. Goodwin does not adduce evidence demonstrating how many videos the Consortium produced following her departure. Ms. Goodwin does not adduce evidence comparing the Consortium's video production output after her termination to its video production before her termination. Ms. Goodwin twice conceded the Consortium's diminished video production, and once asked Chief People Officer Grigore if the diminished video production could lead to her termination.[360] It is also immaterial the Consortium switched to podcast production. The Consortium hired her to produce videos; it did not hire her to produce podcasts.

Ms. Goodwin then asks we disbelieve the University's reasons for deciding to terminate her because Dr. Supovitz's "intense[ly] dislik[ed]" her because her disabilities "became an annoyance to him."[361] Ms. Goodwin does not adduce evidence Dr. Supovitz mistreated her

specifically because of her bipolar disorder. Each of Dr. Supovitz's interactions with Ms. Goodwin concerned her work performance and attendance and did not concern her bipolar disorder. Dr. Supovitz's and Ms. Goodwin's October 2018 interaction began because Dr. Supovitz worried about Ms. Goodwin's attendance.[362] Dr. Supovitz complained to Human Resources Ms. Goodwin demonstrated diminished work output in November 2018.[363] Dr. Supovitz asked Ms. Goodwin to enter a day as paid time off because he did not see her at work.[364] Ms. Goodwin does not tie Dr. Supovitz's concerns about her work performance and attendance to his dislike for her because of her bipolar disorder. Ms. Goodwin instead relies on her own perceptions and feelings the University fired her because of her disability.[365] Ms. Goodwin retracted her assertion Dr. Supovitz removed her from the January 2019 video shoot because of her disability and instead admitted she had "no reason" to believe it related to her bipolar disorder and it was instead "just [her] assumption."[366] Personal hunches and subjective beliefs are insufficient to create a genuine issue of triable fact.[367] Ms. Goodwin does not adduce evidence allowing us to disbelieve the University's legitimate, nondiscriminatory reasons for deciding to terminate her employment.

We next address Ms. Goodwin's theory former co-workers Messrs. Crescenzo and Heumiller are similarly situated to her and received more favorable treatment from the University than she did.[368] Ms. Goodwin argues Mr. Crescenzo is similarly situated to her because they completed the same or similar work like "graphics and sound effects."[369] Ms. Goodwin argues Mr. Heumiller is similarly situated to her because they both "assisted with preproduction of the video shoots" and work "on the same content."[370]

We find Ms. Goodwin does not adduce evidence Messrs. Crescenzo and Heumiller are similarly situated to her. Each had different job responsibilities. Mr. Crescenzo testified

"graphics and sound effects" constituted a "very minimal" portion of his job.[371] The University specifically listed "graphics and sound effects" as a "primary job responsibility" for the Videographer.[372] Mr. Crescenzo served as an assistant on video shoots while Ms. Goodwin as the Videographer ran video shoots.[373] Mr. Heumiller swore he and Ms. Goodwin worked on different aspects of the same content.[374] Ms. Goodwin confirmed Mr. Heumiller and her differing responsibilities in her emails requesting he send his work product to her earlier.[375] Mr. Crescenzo and Ms. Goodwin had different levels of responsibility in video shoots and Mr. Heumiller and Ms. Goodwin worked on different production outputs.

Ms. Goodwin does not adduce evidence creating a genuine issue of triable fact Messrs. Crescenzo and Heumiller are similarly situated to her. Ms. Goodwin does not adduce evidence creating a genuine issue of triable fact the University's legitimate business reasons are pretext for discriminatory or retaliatory intent.

### C. Ms. Goodwin does not adduce evidence creating a genuine issue of triable fact of a hostile work environment.

The University argues Ms. Goodwin fails to create genuine issues of triable fact because she does not adduce evidence of alleged discrimination suffered during her employment occurred "because of [Ms. Goodwin's] disability."[376] The University argues Ms. Goodwin fails to adduce evidence the alleged University discrimination altered the conditions of her employment because it was pervasive or severe.[377] Ms. Goodwin counters Dr. Supovitz demanded she disclose her disability and thereafter Ms. Goodwin "felt bullied, ostracized and physically intimidated by Dr. Supovitz."[378] Ms. Goodwin counters Dr. Supovitz challenged her ability to do her job and request she return to work before her physician cleared her created a hostile work environment.[379]

Ms. Goodwin does not create a genuine issue of material fact Dr. Supovitz created a hostile work environment because Dr. Supovitz's alleged discrimination concerned Ms. Goodwin's work performance and not her bipolar disorder.

An employee alleging a hostile work environment claim must demonstrate: "(1) [she] is a qualified individual with a disability under the ADA; (2) she was subject to unwelcome harassment; (3) the harassment was based on her disability or a request for an accommodation; (4) the harassment was sufficiently severe or pervasive to alter the conditions of her employment and to create an abusive working environment; and (5) [the employer] knew or should have known of the harassment and failed to take prompt effective remedial action."[380] The Americans with Disabilities Act does not require "a happy or even a civil workplace" as it relates to hostile work environment claims.[381] Our Court of Appeals held isolated references to the employee's disability do not create an actionable hostile work environment.[382] Judges in our District grant summary judgment where the alleged interactions concern the employee's work performance and do not reference the employee's disability.[383]

We are guided by Judge Goldberg's decision last month granting summary judgment to a clinical research employer where the employee complained her co-worker mimicked her disability.[384] The drug safety associate in *Rivera* suffered from a stutter and underwent a mastectomy during her tenure.[385] The drug safety associate adduced evidence her co-worker mimicked her stutter at least "twice or three times."[386] The drug safety associate sued the clinical research organization alleging disability discrimination, retaliation, and hostile work environment.[387] Judge Goldberg found the drug safety associate's stutter constituted a disability.[388] Judge Goldberg still granted the clinical research organization summary judgment on the hostile work environment claim finding three instances of derogatory behavior targeting

the drug safety associate's stutter insufficient to create a genuine issue of triable fact she suffered a hostile work environment.[389] Judge Goldberg found her complaints instead amount to "offensive workplace teasing motivated by a personality conflict" with her coworker.[390] Judge Goldberg noted the drug safety associate's subjective perception of this treatment of feeling hurt and demeaned is not sufficient to proceed to a jury on an actionable hostile work environment claim.[391]

We are also guided by Judge Surrick granting summary judgment to a school district where an assistant principal supported her hostile work environment claim with instances of warnings from the principal concerning her attendance.[392] The assistant principal in *Sampson* injured her knee during her tenure.[393] The principal compiled a file detailing each of the assistant principal's "late arrivals" to work following her knee injury.[394] The superintendent suspended the assistant principal for her failing to communicate with anyone at the school concerning an absence.[395] The school district fired the assistant principal stating she behaved "entirely unprofessional, hostile, aggressive, and threatening."[396] The assistant principal sued alleging the school district created a hostile work environment because the principal colluded with the superintendent to mark her absences and late arrivals to work.[397] Judge Surrick granted the school district summary judgment finding the principal's and superintendent's warnings concerning the assistant principal's lateness were not "based on [the assistant principal's] physical impairment."[398]

Ms. Goodwin's allegations Dr. Supovitz created a hostile work environment lack a connection to her bipolar disorder in much the same way as the proofs reviewed by Judges Goldberg and Surrick. Ms. Goodwin testified Dr. Supovitz asked her to disclose her disability following her April 2018 request for accommodation.[399] This is the only interaction Ms.

Goodwin cites connecting her disability to her hostile work environment claim.[400] Ms. Goodwin does not adduce evidence of more than one interaction with Dr. Supovitz concerning her bipolar disorder, two fewer than those considered by Judge Goldberg in his grant of summary judgment. Ms. Goodwin's remaining complained–of interactions with Dr. Supovitz are like those reviewed by Judge Surrick because they concern her work performance and expectations. The interaction with Dr. Supovitz in which he left with fists clenched concerned her attendance at work.[401] Dr. Supovitz's motivation for requesting Ms. Goodwin return to work after her November 2018 ankle fracture stemmed from her poor work performance while she worked from home.[402] None of these interactions involve the type of mimicry about Ms. Goodwin's bipolar disorder Judge Goldberg found unpersuasive in *Rivera*.

We find Ms. Goodwin does not adduce evidence creating a genuine issue of triable fact the University created a hostile work environment because her complained–of incidents are unrelated to her bipolar disorder.

### III   Conclusion

Ms. Goodwin seemingly feels and believes her supervisors at the Consortium discriminated and retaliated against her by firing her several months after learning of her bipolar disorder and a fractured ankle. She also concludes her employer maintained a hostile work environment. But she offers nothing but her feelings and assumptions. She admits many of her theories are assumptions. We cannot find evidence allowing us to find a genuine issue of material fact. Judgment as a matter of law is warranted. We grant the employer's motion for summary judgment.

---

[1] We studied the submitted exhibits to the University's Motion, Ms. Goodwin's Response opposing the University's Motion, and the University's Reply in further support of its Motion. *See* ECF Nos. 33, 33-3, 35, 35-5 to 35-37, 41, 41-2, 41-4.

[2] ECF No. 33-3 at 119. The University told Ms. Goodwin it "may terminate the employment relationship at any time and for any reason." *Id.*

[3] *Id.* at 205-06 (N.T. Supovitz at 16:25-17:2); *Id.* at 250.

[4] *Id.* at 119.

[5] *Id.*

[6] *Id.*

[7] ECF No. 35-33 at 2.

[8] *Id.*

[9] ECF No. 35-35 at 3-4 (N.T. Crescenzo at 9:2-10:2).

[10] ECF No. 33-3 at 224-25 (N.T. Heumiller at 13:14-14:9).

[11] ECF No. 35-36 at 4 (N.T. Heumiller at 15:10-22).

[12] ECF No. 33-3 at 233 (N.T. Goldhahn at 12:7-22).

[13] ECF No. 35-35 at 8-9 (N.T. Crescenzo at 20:21-21:5).

[14] *See* ECF No. 33-3 at 281-82 (N.T. Crescenzo at 23:20-24:18).

[15] *Id.* at 121.

[16] *Id.*

[17] *Id.*

[18] *Id.* at 159 (N.T. Goodwin at 159:4-23).

[19] *Id.* at 38 (N.T. Goodwin at 21:25-22:6).

[20] *Id.* at 128.

[21] *Id.*

[22] *Id.* at 130.

[23] *Id.* at 131.

---

[24] *Id.*

[25] *Id.*

[26] ECF No. 35-10 at 2.

[27] ECF No. 33-3 at 133-34.

[28] *Id.* at 137-38.

[29] *Id.* at 137.

[30] *Id.*

[31] ECF No. 33-3 at 136.

[32] ECF No. 35-9 at 4.

[33] *Id.*

[34] *Id.* at 3-4.

[35] *Id.* at 3.

[36] *Id.*

[37] *Id.* at 2.

[38] ECF No. 35-5 at 41-42 (N.T. Goodwin at 128:13-129:17).

[39] *Id.*

[40] *Id.* at 42-43 (N.T. Goodwin at 129:24-130:5). Dr. Supovitz disputes learning about Ms. Goodwin's bipolar disorder in April 2018 and asserts he learned she suffered from bipolar disorder in October 2018. ECF 33-3 at 211 (N.T. Supovitz at 25:6-14). ("I believe she told me in October, September or October. I think October 2018."). Chief People Officer Grigore's notes reflect Ms. Goodwin "disclosed to [Dr. Supovitz] in the fall [2018] that she had bipolar disorder." ECF No. 33-3 at 363.

[41] ECF No. 33-3 at 208 (N.T. Supovitz at 22:15-19); *see Id.* at 126 (requesting her job description from Human Resources); *Id.* at 53-56 (N.T. Goodwin at 110:16-113:18).

[42] *Id.* at 208-09 (N.T. Supovitz at 22:20-23:15).

[43] *Id.* at 209-10 (N.T. Supovitz at 23:20-24:1).

[44] *Id.* at 126.

[45] ECF No. 35-5 at 37-38 (N.T. Goodwin at 112:3-112:18).

[46] ECF No. 35-11 at 2.

[47] *Id.* ("I've just had an unsettling conversation with michelle [sic] because I went to see her on Friday just before 3 and she was gone, and then I checked Monday morning about 9.35 and she wasn't in yet. I am concerned about her habit of being late and leaving early.").

[48] *Id.*

[49] *Id.*

[50] ECF No. 33-3 at 166-67.

[51] *Id.* at 294 (N.T. Grigore at 13:10-16).

[52] *Id.* at 295-96 (N.T. Grigore at 14:11-15:3).

[53] *Id.* at 296 (N.T. Grigore at 15:4-10).

[54] *Id.* at 361.

[55] *Id.*

[56] *Id.*

[57] *Id.*

[58] *Id.*

[59] *Id.* at 297-98 (N.T. Grigore at 24:23-25:8).

[60] ECF No. 35-5 at 61 (N.T. Goodwin at 181:1-3).

[61] ECF No. 33-3 at 213 (N.T. Supovitz at 28:3-8).

[62] ECF No. 35-18 at 3.

[63] ECF No. 33-3 at 143.

[64] *Id.* at 74 (N.T. Goodwin at 143:8-18).

[65] *Id.* at 398-402.

[66] *Id.* at 400-01.

[67] *Id.*

[68] *Id.* at 400.

[69] *Id.* at 399.

[70] *Id.* at 394-95.

[71]*Id.* at 394.

[72] *Id.*

[73] *Id.* at 396.

[74] ECF No. 35-13 at 1-4.

[75] *See Id.* at 2. The University's Reasonable Accommodation Form includes a section for the employee to complete. The employee must list their job title in this section.

[76] ECF No. 33-3 at 145.

[77] *Id.*

[78] ECF No. 35-5 at 73-74 (N.T. Goodwin at 206:19-207:15).

[79] ECF No. 35-30 at 6.

[80] ECF No. 35-5 at 49 (N.T. Goodwin at 140:5-14).

[81] *Id.* at 49-50 (N.T. Goodwin at 140:20-141:3).

[82] ECF No. 33-3 at 83 (N.T. Goodwin at 164:2-23). The parties jointly moved to file Ms. Goodwin's medical records under seal. ECF No. 32. We granted their motion sealing Ms. Goodwin's medical records including much of her physical therapy paperwork. ECF No. 38.

[83] ECF No. 35-5 at 50 (N.T. Goodwin at 141:8-10).

[84] ECF No. 33-3 at 213-14 (N.T. Supovitz at 28:25-29:3).

[85] *Id.* at 215 (N.T. Supovitz at 34:9-22).

[86] *Id.* at 217.

[87] *Id.*

[88] *Id.*

[89] *Id.*

[90] *See Id.* at 217-18.

[91] *Id.* at 218.

[92] *Id.*

[93] *Id.* at 171-72.

[94] *Id.* at 172.

[95] *Id.*

[96] *Id.* at 170.

[97] *Id.* at 212 (N.T. Supovitz at 26:6-16).

[98] *Id.* at 170.

[99] *Id.*

[100] *Id.* at 398.

[101] *Id.* at 363-64; *see Id.* at 322 (N.T. Grigore at 83:15-85:6) (authenticating her handwritten notes from the January 10, 2019 interview).

[102] *Id.* at 363.

[103] *Id.*

[104] *Id.*

[105] *Id.*

[106] *Id.*

[107] *Id.* at 364.

---

[108] *Id.*

[109] *Id.*

[110] *Id.*

[111] *Id.*

[112] *Id.*

[113] *Id.*

[114] *Id.* at 364-65; *see also Id.* at 284-87 (handwritten notes).

[115] *Id.* at 365.

[116] *Id.*

[117] *Id.*

[118] *Id.*

[119] *Id.*

[120] *Id.* at 366.

[121] *Id.* at 173-74.

[122] *Id.* at 173.

[123] *Id.*

[124] *Id.*

[125] *Id.* at 370-71.

[126] *Id.* at 367.

[127] *Id.*

[128] *Id.*

[129] *Id.*

[130] *Id.*

[131] *Id.*

[132] *Id.*

[133] *Id.* at 379-84.

[134] *Id.* at 380.

[135] *Id.*

[136] *Id.*

[137] *Id.* at 381.

[138] *Id.*

[139] *Id.* at 382.

[140] *Id.*

[141] *Id.* at 383.

[142] *Id.* at 384.

[143] *Id.* at 383.

[144] *Id.* at 311 (N.T. Grigore at 44:15-21).

[145] *Id.* at 147.

[146] *Id.*

[147] *Id.* at 146.

[148] ECF No. 35-22 at 2.

[149] *Id.* at 3.

[150] ECF No. 33-3 at 347.

[151] *Id.* at 348.

[152] *Id.* at 155-58.

[153] ECF No. 35-26 at 2.

[154] ECF No. 33-3 at 159.

[155] ECF No. 35-24 at 5.

[156] *Id.*

[157] *Id.* at 4.

[158] *Id.*

[159] *Id.* at 3.

[160] *Id.* at 2-3.

[161] *Id.* at 3. Ms. Goodwin does not adduce evidence Dr. Supovitz knew of her leave during their January 30, 2019 email exchange.

[162] *Id.*

[163] *Id.* at 2.

[164] *Id.*

[165] ECF No. 33-3 at 307-08 (N.T. Grigore at 40:15-41:19).

[166] *Id.* at 161-63.

[167] *Id.* at 164.

[168] *Id.* at 353.

[169] *Id.*

[170] *Id.* at 197-99.

[171] *Id.* at 197.

[172] *Id.*

[173] ECF No. 35-36 at 7-8 (N.T. Heumiller at 23:9-24:9).

[174] *Id.*

[175] *Id.* (N.T. Heumiller at 23:9-24:17).

[176] *Id.* at 5 (N.T. Heumiller at 16:12-21).

[177] ECF No. 1 ¶¶ 129-143. Our Court of Appeals instructs the Americans with Disabilities Act and the Pennsylvania Human Relations Act are "basically the same" and we should "interpret the [Pennsylvania Human Relations Act] in accord with its federal counterparts." *Rinehimer v. Cemcolift, Inc.*, 292 F.3d 375, 382 (3d Cir. 2002). We therefore apply the reasoning in each section of this Memorandum addressing Ms. Goodwin's Americans with Disabilities Act claims to her Pennsylvania Human Relations Act claims.

[178] ECF No. 1 ¶¶ 49, 53-55, 57, 85.

[179] *Id.* ¶¶ 52, 67-69, 75-76, 82-83, 87-89, 95-97, 102.

[180] ECF No. 33-1 at 6-18. Summary judgment is proper when "the movant shows that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a). "Material facts are those 'that could affect the outcome' of the proceeding, and 'a dispute about a material fact is 'genuine' if the evidence is sufficient to permit a reasonable jury to return a verdict for the non-moving party.'" *Pearson v. Prison Health Serv.*, 850 F.3d 526, 534 (3d Cir. 2017) (quoting *Lamont v. New Jersey*, 637 F.3d 177, 181 (3d Cir. 2011)). "Summary judgment is appropriate only if, after drawing all reasonable inferences in favor of the non-moving party, there exists 'no genuine dispute as to any material fact' and the movant 'is entitled to judgment as a matter of law.'" *Moyer v. Patenaude & Felix, A.P.C.*, 991 F.3d 466, 469 (3d Cir. 2021) (quoting *Shuker v. Smith & Nephew, PLC*, 885 F.3d 760, 770 (3d Cir. 2018)). We do not weigh evidence or make credibility determinations. *Peroza-Benitez v. Smith*, 994 F.3d 157, 164 (3d Cir. 2021) (quoting *Baloga v. Pittston Area Sch. Dist.*, 927 F.3d 742, 752 (3d Cir. 2019)).

"The party seeking summary judgment 'has the burden of demonstrating that the evidentiary record presents no genuine issue of material fact.'" *Parkell v. Danberg*, 833 F.3d 313, 323 (3d Cir. 2016) (quoting *Willis v. UPMC Children's Hosp. of Pittsburgh*, 808 F.3d 638, 643 (3d Cir. 2015)). If the movant carries its burden, "the nonmoving party must identify facts in the record that would enable them to make a sufficient showing on essential elements of their case for which they have the burden of proof." *Willis*, 808 F.3d at 643 (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). "If, after adequate time for discovery, the nonmoving party has not met its burden, pursuant to Federal Rule of Civil Procedure 56, the court must enter summary judgment against the nonmoving party." *Id.* (citing *Celotex*, 477 U.S. at 322–23).

[181] ECF No. 33-1 at 17-18.

[182] *Id.* at 19-22.

[183] *Id.* at 23-25.

[184] ECF No. 35-2 at 12-16.

[185] *Id.* at 16-22.

[186] *Id.* at 26-27.

[187] *Id.* at 27-29.

[188] *Id.* at 29-32.

[189] *Id.* at 32-34.

[190] ECF No. 41 at 4-7.

[191] *Id.* at 7-8.

[192] *Id.* at 8-11, 13-14.

[193] *Id.* at 11-13.

[194] *Id.* at 14-15.

[195] *Id.* at 15-19.

[196] *Id.* at 19-20.

[197] ECF No. 33-1 at 6-17.

[198] *Id.*

[199] ECF No. 35-2 at 11-27.

[200] *Id.*

[201] ECF No. 33-1 at 6-8.

[202] *Id.* at 8-10.

[203] ECF No. 35-2 at 12.

[204] *Id.* at 12-13.

[205] *Id.* at 14-16.

[206] *Fowler v. AT&T, Inc.*, 19 F.4th 292, 299 (3d Cir. 2021) (recounting the elements for an Americans with Disabilities Act discrimination claim); *Wright v. Providence Care Ctr., LLC*, 822 F. App'x 85, 95 (3d Cir. 2020) (recounting the elements of an Americans with Disabilities Act hostile work environment claim).

[207] 42 U.S.C. § 12102(1)(A)-(C).

[208] 42 U.S.C. § 12102(3)(A).

[209] 42 U.S.C. § 12102(3)(B).

[210] *Budhun v. Reading Hosp. & Med. Ctr.*, 765 F.3d 245, 259-60 (3d Cir. 2014) (citing section 12102(1)(C)).

[211] *Brearey v. Brennan*, No. 17-2108, 2019 WL 111037 (E.D. Pa. Jan. 4, 2019). *Brearey* involves a claim under the Rehabilitation Act. *Id.* at *1. Our Court of Appeals mandates we review Rehabilitation Act claims under the standards Congress set forth in the Americans with Disabilities Act. *Wishkin v. Potter*, 476 F.3d 180, 184-85 (3d Cir. 2007).

[212] *Brearey*, 2019 WL 111037 at *2.

[213] *Id.*

[214] *Id.* at *3.

[215] *Id.* at *2.

[216] *Id.* at *4, 7.

[217] *Id.* at *6.

[218] *See id.* at *8.

[219] *McMullen v. Gardens at W. Shore*, No. 21-1446, 2023 WL 3077803 (M.D. Pa. Apr. 25, 2023).

[220] *Id.* at *1.

[221] *Id.*

[222] *Id.* at *4.

[223] *Id.*

[224] ECF No. 35-18 at 3.

[225] ECF No. 33-3 at 145.

[226] *Id.* at 83 (N.T. Goodwin at 164:2-23).

[227] ECF No. 35-5 at 49-50 (N.T. Goodwin at 140:20-141:10).

[228] *See* ECF No. 33-3 at 83 (N.T. Goodwin at 164:2-23).

[229] *Budhun*, 765 F.3d at 259-60.

[230] *McMullen,* 2023 WL 3077803, at *4.

[231] *Id.*

[232] *See* ECF No. 33-3 at 172.

[233] ECF No. 33-1 at 10-12.

[234] ECF No. 35-2 at 17-18.

[235] *Id.* at 18-22.

[236] *Shaner v. Synthes*, 204 F.3d 494, 500 (3d Cir. 2000).

[237] *Id.*

[238] *Id.*

[239] *Id.*

[240] *Id.* at 500-01.

[241] We grant the University summary judgment on discrimination and harassment claims brought under the Americans with Disabilities Act predicated on Ms. Goodwin's ankle fracture. But even if we did find her ankle fracture constituted a disability under the Americans with Disabilities Act, Ms. Goodwin fails to adduce evidence the University fired her for reasons other than the Consortium's financial considerations.

[242] *Id.* at 500.

[243] ECF No. 33-1 at 10-12.

[244] *Id.* at 10 n.6.

[245] *Jakomas v. City of Pittsburgh*, 342 F. Supp. 3d 632, 643 (W.D. Pa. 2018).

[246] *Gorman v. Acteon Networks, LLC*, No. 19-5818, 2021 WL 2156359, at *6 (E.D. Pa. May 26, 2021) (quoting *Farrell v. Planters Lifesavers Co.*, 206 F.3d 271, 280 (3d Cir. 2000)).

[247] *Fiorentini v. William Penn Sch. Dist.*, 665 F. App'x 229, 237 (3d Cir. 2016).

[248] *See* ECF No. 33-3 at 215 (N.T. Supovitz at 34:9-22) (testifying he drafted the decision to eliminate the videographer position on January 2, 2019); ECF No. 33-3 at 197-99 (firing Ms. Goodwin on August 5, 2019).

[249] *See* ECF No. 35-5 at 41 (N.T. Goodwin at 128:13-129:17).

[250] ECF No. 33-1 at 10-11.

[251] ECF No. 35-2 at 17-18.

[252] *Id.*

[253] *Hollingsworth v. R. Home Prop. Mgmt., LLC*, 498 F. Supp. 3d 590, 603 (E.D. Pa. 2020).

[254] *Id.* (citing *Williams v. Philadelphia Housing Auth. Police Dep't*, 380 F.3d 751, 760 (3d Cir. 2004)).

[255] ECF No. 35-5 at 42 (N.T. Goodwin at 129:24-130:5). Dr. Supovitz disputes learning about Ms. Goodwin's bipolar disorder in April 2018 and asserts he learned she suffered from bipolar disorder in October 2018. ECF 33-3 at 211 (N.T. Goodwin at 25:6-14). ("I believe she told me in October, September or October. I think October 2018."). Chief People Officer Grigore's notes reflect Ms. Goodwin "disclosed to [Dr. Supovitz] in the fall [2018] that she had bipolar disorder." ECF No. 33-3 at 363. We must draw all inferences in Ms. Goodwin's favor and accept her adduced April 2018 disclosure date despite the parties' disagreement on the disclosure's timing. *See Moyer v. Patenaude & Felix, A.P.C.*, 991 F.3d 466, 469 (3d Cir. 2021).

[256] ECF No. 33-1 at 10-12.

[257] ECF No. 35-2 at 18-19. Ms. Goodwin cites two cases supporting the notion she can show a causal connection through ongoing antagonism sufficient to establish a prima facie disability discrimination claim. *See* ECF No. 35-2 at 18-19. Both cases arise under a from motions to dismiss. *See Hartley v. Boeing Co.*, No. 19-373, 2019 WL 2448656 (E.D. Pa. June 10, 2019); *Polk v. Brandywine Hosp.*, No. 15-1763, 2015 WL 3755776 (E.D. Pa. June 16, 2015). One case cites to our Court of Appeals guidance to support its application of the ongoing "antagonism" test to assessing the prima facie disability discrimination claim. *See Hartley*, 2019 WL 2448656, at *5 (quoting *Daniels v. Sch. Dist. of Philadelphia*, 776 F.3d 181, 193 (3d Cir. 2015)). Our Court of Appeals in *Daniels* applied the "antagonism" test to a *retaliation* claim. *Daniels*, 776 F.3d at 193 (emphasis added). The other discusses the "pattern of antagonism" test in its analysis

of a *retaliation* claim. *See Polk*, 2015 WL 3755776, at *2-3 (emphasis added). We will not apply the antagonism test to the prima facie disability discrimination claim and will not apply cases decided under other standards.

We also address Ms. Goodwin's theory evidence of the employer treating a disabled employee less favorably than "similarly situated" employees demonstrate a causal connection sufficient to establish a prima facie disability discrimination claim. This is not so. Our Court of Appeals addresses the "similarly situated" test when evaluating whether the employee demonstrates the employer exhibited pretext in firing the employee. *Wright v. Providence Care Ctr., LLC*, 822 Fed. App'x 85, 92 (3d Cir. 2020).

[258] *See* ECF No. 35-2.

[259] *Fiorentini,* 665 F. App'x at 237.

[260] *Id.*

[261] *Campo v. Mid-Atl. Packaging Specialties, LLC*, 564 F. Supp. 3d 362 (E.D. Pa. 2021).

[262] *Id.* at 370.

[263] *Id.* at 371-74.

[264] *Id.* at 375-79.

[265] *Id.* at 368.

[266] *Id.* at 381-82.

[267] *Id.* at 382.

[268] *See* ECF No. 33-3 at 126 (requesting her job description from Human Resources); *Id.* at 53-56 (N.T. Goodwin at 110:16-113:18).

[269] *Id.* at 364.

[270] *See Fiorentini,* 665 F. App'x at 237.

[271] ECF No. 33-3 at 363.

[272] *Id.* at 217-18.

[273] *Id.* at 197.

[274] ECF No. 33-1 at 12-15.

[275] ECF No. 35-2 at 22-26.

[276] *Wells v. Retinovitreous Assocs., Ltd.*, No. 15-5675, 2016 WL 3405457, at *2 (E.D. Pa. June 21, 2016), *aff'd*, 702 F. App'x 33 (3d Cir. 2017) (citing *Budhun*, 765 F. 3d at 256) ("Plaintiff's retaliation claims under the FMLA, ADA, and PHRA are all analyzed under the *McDonnell Douglas* burden-shifting framework.").

[277] *Fogleman v. Mercy Hosp., Inc.*, 283 F.3d 561, 567-68 (3d Cir. 2002).

[278] *See* ECF No. 33-1 at 12-15.

[279] *Palmer v. Fed. Express Corp.*, 235 F. Supp. 3d 702, 723 (W.D. Pa. 2016) (citing *Bailey v. Com. Nat. Ins. Servs., Inc.*, 267 F. App'x 167, 170 (3d Cir. 2008)); *Shellenberger v. Summit Bancorp, Inc.*, 318 F.3d 183, 191 (3d Cir. 2003).

[280] *Krouse v. Am. Sterilizer Co.*, 126 F.3d 494, 502 (3d Cir. 1997).

[281] ECF No. 33-1 at 13.

[282] ECF No. 35-2 at 23-24.

[283] *Krouse*, 126 F.3d at 504.

[284] *Shaner*, 204 F.3d at 505.

[285] *Williams*, 380 F.3d at 760.

[286] ECF No. 33-3 at 128; ECF No. 33-3 at 143; ECF No. 35-13; ECF No. 35-22 at 2.

[287] ECF No. 33-3 at 166-67, 364-65; *see also id.* at 284-87 (handwritten notes); ECF No. 35-24 at 2-3.

[288] ECF No. 33-1 at 14-15.

[289] ECF No. 35-2 at 24-25.

[290] *Gera v. Cnty. of Schuylkill*, 617 F. App'x 144, 147 (3d Cir. 2015).

[291] *Sawl v. Shulkin*, No. 16-1440, 2018 WL 4501061, *12 (W.D. Pa. Aug. 27, 2018), report and recommendation adopted sub nom. *Sawl v. Wilkie*, No. 16-1440, 2018 WL 4491182 (W.D. Pa. Sept. 19, 2018).

[292] *Robinson v. Se. Pennsylvania Transp. Auth., Red Arrow Div.*, 982 F.2d 892, 895 (3d Cir. 1993).

[293] *Id.*

[294] *Id.*

[295] *Id.*

[296] *Id.*

[297] *Id.*

[298] *Moore v. City of Philadelphia*, 461 F.3d 331 (3d Cir. 2006).

[299] *Id.* at 337.

[300] *Id.* at 339.

[301] *Id.*

[302] *Id.* at 347. Our Court of Appeals considers a "pattern of antagonism" and "retaliatory animus" one in the same. *See Farrell,* 206 F.3d at 278.

[303] *Martinez v. Rapidigm, Inc.*, 290 F. App'x 521 (3d Cir. 2008).

[304] *Id.* at 522.

[305] *Id.* at 523.

[306] *Id.*

[307] *Id.* at 526.

[308] *Patel v. Shinseki*, 984 F. Supp. 2d 461, 477 (W.D. Pa. 2013).

[309] *Id.* at 474. Judge Hornak found it unclear whether Dr. Patel engaged in protected conduct but analyzed his retaliation claim assuming he had. *Id.*

[310] *Id.* at 477.

[311] *Id.* at 478.

[312] *Id.*

[313] *Id.*

---

[314] ECF No. 35-11 at 2 ("I've just had an unsettling conversation with michelle [sic] because I went to see her on Friday just before 3 and she was gone, and then I checked Monday morning about 9.35 and she wasn't in yet. I am concerned about her habit of being late and leaving early.").

[315] ECF No. 33-3 at 361.

[316] *Id.*

[317] *Id.* at 296 (N.T. Grigore at 15:4-10).

[318] *Martinez v. Rapidigm, Inc.*, 290 F. App'x 521 (3d Cir. 2008).

[319] ECF No. 33-3 at 170, 212 (N.T. Supovitz at 26:6-16).

[320] *Id.* at 171.

[321] *Id.* at 363.

[322] *Id.* at 311 (N.T. Grigore 44:15-21).

[323] *Id.* at 380, 382.

[324] ECF No. 35-24 at 3-5.

[325] *Id.* at 3.

[326] ECF No. 33-3 at 307-08 (N.T. Grigore at 40:15-41:19).

[327] ECF No. 33-1 at 15-17.

[328] ECF No. 35-2 at 26-27.

[329] *Budhun,* 765 F.3d at 256.

[330] *See id.*

[331] *Id.*

[332] *Id.*

[333] *Capps v. Mondelez Glob. LLC*, 147 F. Supp. 3d 327, 337 (E.D. Pa. 2015), *aff'd*, 847 F.3d 144 (3d Cir. 2017) (citing *Abdul-Latif v. Cnty. of Lancaster*, 990 F. Supp. 2d 517, 531 (E.D. Pa. 2014)).

[334] *Capps*, 147 F. Supp. 3d at 337 (citing *Blakney v. City of Philadelphia*, 559 F. App'x 183, 186 (3d Cir. 2014)).

[335] ECF No. 33-3 at 155-58.

[336] *Id.* at 197-99.

[337] *Id.* at 353.

[338] Ms. Goodwin does not argue she suffered a pattern of antagonism between her first request for medical leave and her firing asserting different evidence than we previously considered.

[339] *Shaner,* 204 F.3d at 500. This applies to Ms. Goodwin's disability discrimination, disability retaliation, and Family and Medical Leave Act retaliation claims.

[340] *See Andersen v. Mack Trucks, Inc.*, 118 F. Supp. 3d 723, 741 (E.D. Pa. 2015), *aff'd*, 647 F. App'x 130 (3d Cir. 2016).

[341] *Stager v. Beverly Health & Rehab. Servs., Inc.*, No. 2006-101, 2008 WL 3165837, at *12 (W.D. Pa. Aug. 6, 2008).

[342] ECF No. 33-3 at 17-18.

[343] ECF No. 35-2 at 27-29.

[344] We pause to address Ms. Goodwin's argument the University lacked a legitimate and nondiscriminatory reason for firing her because her role changed from "Videographer" to "Video and Podcast Producer." Ms. Goodwin cites her reasonable accommodation request form as the basis evidencing her change in job title. ECF No. 35-2 at 27-29. To be clear, the section of the form to which Ms. Goodwin cites is "To be completed by [the] Employee," ECF No. 35-13 at 2, a fact noted by the University. ECF No. 41-3 ¶ 40. Advancing a self-styled job title in the absence of corroborating evidence does not create a genuine dispute of material fact.

[345] ECF No. 33-3 at 217.

[346] *Id.* at 119.

[347] *See id.* at 217-18.

[348] ECF No. 33-1 at 19-22.

[349] ECF No. 35-2 at 29-31.

[350] *Id.* at 31-32.

[351] *Wright v. Providence Care Ctr., LLC*, 822 F. App'x  85, 91 (3d Cir. 2020).

[352] *Dinnerstein v. Burlington Cnty. Coll.*, No. 13-5598, 2017 WL 5593776, at *5 (D.N.J. Nov. 21, 2017), *aff'd*, 764 F. App'x 214 (3d Cir. 2019).

[353] *Id.* (quoting *Fuentes v. Perskie*, 32 F.3d 759, 764 (3d Cir. 1994)).

[354] *Fuentes*, 32 F.3d at 765.

[355] *Proudfoot v. Arnold Logistics, LLC*, 59 F. Supp. 3d 697, 708 (M.D. Pa. 2014), *aff'd*, No. 14-4703, 2015 WL 5881530 (3d Cir. Oct. 8, 2015).

[356] *George v. Lehigh Valley Health Network (Muhlenberg Hosp.)*, No. 12-2239, 2014 WL 1464327, at *4 (E.D. Pa. Apr. 15, 2014) (citing *Warfield v. SEPTA*, 460 F. App'x 127, 130 (3d Cir. 2012)).

[357] *Wilcher v. Postmaster Gen.*, 441 F. App'x 879, 882 (3d Cir. 2011).

[358] ECF No. 35-2 at 30.

[359] ECF No. 35-36 at 7-8 (N.T. Heumiller at 23:9-24:17).

[360] ECF No. 33-3 at 53-56 (N.T. Goodwin at 110:16-113:18); ECF No. 33-3 at 364 (asking if the University might eliminate her Videographer position for lack of work).

[361] ECF No. 35-2 at 31-32.

[362] ECF No. 35-11 at 2 ("I've just had an unsettling conversation with michelle [sic] because I went to see her on Friday just before 3 and she was gone, and then I checked Monday morning about 9.35 and she wasn't in yet. I am concerned about her habit of being late and leaving early.").

[363] ECF No. 33-3 at 394.

[364] ECF No. 35-24 at 5.

[365] ECF No. 33-3 at 137 (stating her extended probationary period "feels like discrimination" because of her bipolar disorder); ECF No. 35-24 at 3 (stating Dr. Supovitz's request she log an off-day "feel[s] that this action may be retaliatory in nature.").

[366] ECF No. 33-3 at 363.

[367] *Dinnerstein v. Burlington Cnty. Coll.*, No. 13-5598, 2017 WL 5593776, at *5 (D.N.J. Nov. 21, 2017), *aff'd*, 764 F. App'x 214 (3d Cir. 2019).

[368] Ms. Goodwin argued in her response whether she received worse treatment as compared to "similarly situated" employees concerned causation in her discrimination case. ECF No. 35-2 at 19-22.

[369] ECF No. 35-2 at 19-20.

[370] *Id.* at 20.

[371] ECF No. 35-35 at 8-9 (N.T. Crescenzo at 20:21-21:5).

[372] ECF No. 33-3 at 121.

[373] *Compare* ECF No. 33-1 at 281-82 (N.T. Crescenzo at 23:20-24:13) *with* ECF No. 33-3 at 121. Ms. Goodwin herself refers to Mr. Crescenzo as her "assistant." ECF No. 35-2 at 33.

[374] ECF No. 35-36 at 4 (N.T. Heumiller at 15:10-22).

[375] ECF No. 33-3 at 384.

[376] ECF No. 33-1 at 23-24.

[377] *Id.* at 25.

[378] ECF No. 35-2 at 32-33.

[379] *Id.* at 33.

[380] *Ballard-Carter v. Vanguard Grp.*, 703 F. App'x 149, 151-52 (3d Cir. 2017).

[381] *Id.* at 152.

[382] *Id.* at 153 (granting summary judgment to financial services company where email placed quotations around the word "heard" when referring to a deaf employee).

[383] *Hanafy v. Hill Int'l, Inc.*, No. 22-878, 2023 WL 3010176, at *12 (E.D. Pa. Apr. 19, 2023).

[384] *Rivera v. PRA Health Sciences, et al.*, No. 22-2551, 2023 WL 7021183 (E.D. Pa. Oct. 24, 2023).

[385] *Id.* at *1.

[386] *Id.* at *2.

[387] *Id.* at *4.

[388] *Id.* at \*10.

[389] *Id.* at \*6.

[390] *Id.* at \*6.

[391] *Id.* at \*7.

[392] *Sampson v. Methacton Sch. Dist.*, 88 F. Supp. 3d 422 (E.D. Pa. 2015).

[393] *Id.* at 429.

[394] *Id.* at 431.

[395] *Id.* at 432.

[396] *Id.* at 434.

[397] *Id.* at 445.

[398] *Id.*

[399] ECF No. 35-5 at 41-42 (N.T. Goodwin at 128:13-129:17).

[400] *See* ECF No. 33-3; ECF No. 35-5 to 35-57.

[401] ECF 33-3 at 296 (N.T. Grigore at 15:4-10).

[402] *Id.* at 394.